## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DANIEL F. CONLEY, ANGELA SCUNZIANO, PAUL ROHAN, IMAN JONES, BARTLEY WILSON, WALTER COGGESHALL,YOLANDA STARK, ALLEN SMOCK, ANDREW FISHER, MIA COLEMAN, PAUL MIYAHIRA, JULES LABONTE, CHRISTOPHER GLAUB, LAURELANN PORTER, DEANNA MELCHER, PAUL BAILEY, CHRISTINE DIJOHN, JOHN COOK, MATTHEW WARD, JOHN POLAND, JOSE LOPEZ, CHAD WELLS, WILLIAM VLAHOS, EUGENE WOHLFARTH, CAMERON ROSE, TAWNYA PORTER, LYNN ANN KOENCK, DELORES BROWN, FORREST STAFFORD, MURRAY CRAIG, TONY JONES, ELAINE LIZOTTE, ROBERT MCNULTY, DAVID JOSEPH MARTIN, WILLIAM WORMAN, ANTONIO PEREZ BONANO, RACHAEL DIMAIO, LISA BROWN, ROBERT MCCLAY, ROBERT SHUCKIT, DONALD BASEMORE, JOHN BURLISON, DAVID GORRIS, MARK WELKER, CHARLES PINCK, CHRIS BROWN, ADAM HALE, CARLOS OLDIGS, STEVE ABARR, PHILIP BEAN, JULIE LONGWAY, JOSEPH RYAN, HEATH BYERS, DIANE LAMONTAGNE, DAVID BAYS, BENEDICT NAGY, JR., DUANE ALT,  CARL GOLD, MYRON FIELDS, JO DAWN WARD, GARY JACOBS, ADAM MCLEAN, VICKI CHAMBERS, JIMMY ARRIAGA, PAUL DUNN, AND HARRIS JENKINS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs, | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

v.                                                                :
                                                                  :
KONINKLIJKE PHILIPS N.V., PHILIPS                                 :
NORTH AMERICA LLC, and PHILIPS                                    :
RS NORTH AMERICA LLC,                                             :
                                                                  :
                    Defendants.                                   :
                                                                  :
                                                                  :
                                                                  :

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................ 1

II.    THE PARTIES ......................................................................................... 4

    A.     PLAINTIFFS ...............................................................................4

    B.     DEFENDANTS .............................................................................22

III.   JURISDICTION AND VENUE ................................................................. 23

IV.    FACTUAL ALLEGATIONS ..................................................................... 23

    A.     CPAP and BiPAP machines and ventilators treat serious conditions. .................23

    B.     Philips sells CPAP and BiPAP Machines and Ventilators containing PE-PUR foam. ...............................................................................................25

    C.     Philips recalled its PE-PUR Foam-Containing machines due to serious health hazards that they cause. ....................................................................28

    D.     Philips Has Known about the PE-PUR foam problems for years. ........................34

    E.     Philips has not replaced the recalled devices and does not plan to do so in the near future. ...............................................................................36

V.     CLASS ALLEGATIONS ......................................................................... 38

VI.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS ................. 44

VII.   CAUSES OF ACTION ............................................................................ 44

    COUNT 1 - ...........................................................................................44

    COUNT 2 ..............................................................................................45

    COUNT 3 ..............................................................................................46

    COUNT 4 ..............................................................................................47

    COUNT 5 ..............................................................................................48

    COUNT 6 ..............................................................................................48

    COUNT 7 ..............................................................................................49

    COUNT 8 ..............................................................................................50

    COUNT 9 ..............................................................................................52

COUNT 10 ...................................................................................................53

COUNT 11 ...................................................................................................55

COUNT 12 ...................................................................................................56

COUNT 13 ...................................................................................................59

COUNT 14 ...................................................................................................61

COUNT 15 ...................................................................................................63

COUNT 16 ...................................................................................................65

COUNT 17 ...................................................................................................67

COUNT 18 ...................................................................................................68

COUNT 20 ...................................................................................................71

COUNT 21 ...................................................................................................73

COUNT 22 ...................................................................................................75

COUNT 23 ...................................................................................................76

COUNT 24 ...................................................................................................78

COUNT 25 ...................................................................................................79

COUNT 26 ...................................................................................................81

COUNT 27 ...................................................................................................82

COUNT 28 ...................................................................................................84

COUNT 29 ...................................................................................................85

COUNT 30 ...................................................................................................87

COUNT 31 ...................................................................................................88

COUNT 32 ...................................................................................................89

COUNT 33 ...................................................................................................91

COUNT 34 ...................................................................................................92

COUNT 35 ...................................................................................................93

COUNT 36 ...................................................................................................95

COUNT 37 ...................................................................................................97

COUNT 38 ...................................................................................................99

COUNT 39 .................................................................................................100

COUNT 40 .................................................................................................101

COUNT 41 .................................................................................................103

COUNT 42 .................................................................................................104

COUNT 43 .................................................................................................106

COUNT 44 .................................................................................................108

COUNT 45 .................................................................................................109

COUNT 46 .................................................................................................111

COUNT 47 .................................................................................................112

COUNT 48 .................................................................................................114

COUNT 49 .................................................................................................115

COUNT 50 .................................................................................................116

PRAYER FOR RELIEF .................................................................................. 117

JURY DEMAND........................................................................................... 118

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs Daniel F. Conley, Angela Scunziano, Paul Rohan, Iman Jones, Bartley Wilson, Walter Coggeshall, Yolanda Stark, Allen Smock, Andrew Fisher, Mia Coleman, Paul Miyahira, Jules Labonte, Christopher Glaub, Laurelann Porter, Deanna Melcher, Paul Bailey, Christine DiJohn, John Cook, Matthew Ward, John Poland, Jose Lopez, Chad Wells, Williams Vlahos, Eugene Wohlfarth, Cameron Rose, Tawnya Porter, Lynn Ann Koenck, Delores Brown, Forrest Stafford, Murray Craig, Tony Jones, Elaine Lizotte, Robert McNulty, David Joseph Martin, William Worman, Antonio Perez Bonano, Rachael DiMaio, Lisa Brown, Robert McClay, Robert Shuckit, Donald Basemore, John Burlison, David Gorris, Mark Welker, Charles Pinck, Chris Brown, Adam Hale, Carlos Oldigs, Steve Abarr, Philip Bean, Julie Longway, Joseph Ryan, Heath Byers, Diane Lamontagne, David Bays, Benedict Nagy, Jr., Duane Alt, Carl Gold, Jo Dawn Ward, Myron Fields, Gary Jacobs, Adam Mclean, Vicki Chambers, Jimmy Arriaga, Paul Dunn, and Harris Jenkins, individually and on behalf of all others similarly situated, through their undersigned counsel, allege as follows.

## I.     <u>NATURE OF THE ACTION</u>

1.     Plaintiffs collectively are residents of the following **51** United States jurisdictions: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, Washington, D.C., West Virginia, Wisconsin, and Wyoming.

1

2.      Defendants Koninklijke Philips N.V., Philips North America LLC, and Philips RS North America LLC (collectively, "Philips") manufacture and sell a variety of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and ventilators, which treat respiratory failure. In general, all of these devices blow air into patients' airways. CPAP and BiPAP machines are intended for daily use while sleeping, and ventilators are used continuously while needed. Without these devices, patients may experience severe symptoms including heart attack, stroke, and death by asphyxiation.

3.      On June 14, 2021, Philips announced a recall of millions of its CPAP/BiPAP machines and ventilators. These products contain polyester-based polyurethane ("PE-PUR") foam for sound abatement. Philips announced that the foam may break down and be inhaled or ingested, or may emit volatile organic compounds ("VOCs") that may be inhaled, resulting in adverse effects to organs or cancer. Philips stated that the potential risks of exposure due to such chemical emissions include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects. Philips's announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

4.      On July 22, 2021 the U.S. Food and Drug Administration ("FDA") confirmed the severity of the problem, and classified the recall of Philips' breathing devices at issue as a Class I recall, or "the most serious type of recall," meaning use of the devices "may cause serious injuries or death."[1]

---

[1] https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and.

5.      In truth, Philips knew about these very serious risks long before the recall. Patients who use the affected devices have complained about black particles in their machines for many years. And while Philips notified its shareholders about the defect in late April 2021, it did not recall its machines until June 14, 2021.

6.      Philips' recall is a "recall" in name only. Philips has failed its customers since providing its late notice of the problems. For example, Philips has not offered its customers a refund for their purchase of the recalled devices so that they can purchase an alternative breathing machine. Nor has Philips actually replaced or repaired any of the affected devices. Although patients need to use their devices every day, Philips has no concrete timeline for replacing any devices and may not provide replacements or repairs for a year or more.

7.      In fact, it appears that Philips timed its recall to coincide with its launch of a next generation of the affected products, which Philips claims does not suffer from the same foam issues. Thus, the only safe option that Philips currently offers to its customers—many of whom need a BiPAP/CPAP machine to sleep—is to purchase, at full price, Philips's new, next-generation device, thus profiting Philips further.

8.      Because of the increased demand and shortage of microchips, replacement machines are very difficult to find and only available at inflated prices. Many users have thus been forced by Philips into a Hobson's choice—continue using Philips' recalled machines exposing themselves to a risk of serious injury or death, or stop using Philips' recalled machines exposing themselves to a risk of serious injury or death.

9.      Each of the Plaintiffs acquired a device that Philips has now recalled. They would not have obtained the device at the price that they paid, or at all, if they had known that the PE-PUR foam in the device could cause serious injury or death.

10.     Plaintiffs, on behalf of themselves and other similarly situated individuals who also paid for the defective devices, seek to recover damages from Philips based on strict liability, negligence, breach of express warranty, breach of implied warranty, the Magnuson Moss Warranty Act, unjust enrichment, and applicable state consumer protection and deceptive trade practices statutes. Plaintiffs also seek medical monitoring damages for users of devices.

## II.     THE PARTIES

### A.     PLAINTIFFS[2]

11.     Plaintiff Daniel F. Conley resides in West Roxbury, Massachusetts. From 1994 to 2002, Plaintiff Conley served on the Boston City Council. From 2002-2018, Plaintiff Conley served as the District Attorney for Suffolk County, Massachusetts, and was elected to four consecutive terms. In or around April 2020, Daniel Conley acquired a DreamStation CPAP to treat his sleep apnea. Plaintiff Conley would not have obtained the device if he had known it was defective. Plaintiff Conley wants a refund, replacement with a non-defective device,[3] costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he suffered as a result of the defective device. In particular, as a four-term District Attorney of Suffolk County, Massachusetts, Plaintiff Conley's participation as a named Plaintiff and class representive in this litigation is meaningful and significant, as he has handled, overseen, and managed complex

---

[2] Each of the Named Plaintiffs is also a proposed Class Representative for the state law subclass in which they reside.

[3] Any time reference is made in this Class Action Complaint to a refund, it also refers to a refund of any related accessories purchased by the Plaintiff or Class member that can no longer be used, and any time reference is made in this Class Action Complaint to costs of replacement of a recalled breathing device, it also refers to the costs of any related accessories that need to be purchased by the Plaintiff or Class Member accompanying the replacement device. The term "accessories" as used in this Class Action Complaint includes, for example, masks, filters, cushions, tubes, hoses, power cords, converters, and humidifiers.

4

litigation for decades, and the Court can be assured that along with his co-Plaintiffs, he will well represent the proposed Class members in this litigation.

12.     Plaintiff John Cook resides in Attala, Alabama. John Cook acquired a Philips DreamStation to treat sleep apnea. Plaintiff Cook is experiencing headaches, fatigue, coughing, trouble breathing, and sneezing. Plaintiff Cook would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

13.     Plaintiff Mark Welker resides in Anchorage, Alaska. In 2021, Plaintiff Welker acquired two Philips DreamStation machines to treat sleep apnea. Plaintiff Welker would not have obtained the devices if he had known they were defective. Plaintiff Welker wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

14.     Plaintiff Laurelann Porter resides in Mesa, Arizona. In or around 2019, Plaintiff Porter obtained a Philips DreamStation to treat sleep apnea. Laurelann Porter is experiencing chronic pain and chronic fatigue, trouble sleeping, shortness of breath, and a dry cough. Plaintiff Porter would not have acquired the device if she had known it was defective. Laurelann Porter wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device .

15.     Plaintiff Deanna Melcher resides in Hazen, Arkansas.  She obtained a DreamStation in March 2020 to treat moderate to severe sleep apnea. Since using her DreamStation, she has suffered hoarseness, frequent sore throat, bronchitis, and upper respiratory irritation. She would not have acquired the device if she had known it was defective. She wants a refund, replacement

with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

16.     Plaintiff Paul Bailey resides in Aptos, California. Mr. Bailey acquired a DreamStation CPAP machine in 2018 to treat sleep apnea. Mr. Bailey, like all the Plaintiffs, is very worried about future health issues that may arise as a result of the use of his DreamStation. He would not have obtained the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

17.     Plaintiff Christine DiJohn resides in Hemet, California. She obtained a DreamStation BiPAP machine in 2018 to treat sleep apnea. Since using her device, she has had numerous asthma attacks which have led to multiple Emergency Room and doctor visits. She has had to be admitted to the hospital several times since using her device, where she has been treated with multiple high-dose steroid injections, breathing treatments, and oxygen supplementation. Her hospital admissions have each lasted at least three days. She experiences daily acute, severe headaches, nasal irritation, shortness of breath, heart palpitations, higher blood pressure, swollen tonsils and throat, and severe coughing. She has been having difficulty sleeping and is experiencing fatigue and drowsiness. This is interfering with her daily activities. She would not have acquired the device if she had known it was defective. She wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

18.     Plaintiff Bartley Wilson resides in Monument, Colorado. In 2019, Bartley Wilson obtained a Philips DreamStation to treat sleep apnea. As a result of the machine, Plaintiff Wilson is experiencing coughing. Bartley Wilson would not have acquired the device if he had known it

was defective. Bartley Wilson wants a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

19.     Plaintiff Paul Rohan resides in Westport, Connecticut. In or around May 2019, Plaintiff Rohan obtained a Philips DreamStation to treat sleep apnea. Plaintiff Rohan would not have acquired the device if he had known it was defective. In response to the recall, Plaintiff Rohan purchased a replacement machine for approximately $883. Paul Rohan wants replacement with a non-defective device, as with all of the Plaintiffs the economic losses associated with any costs spent on a replacement device and accessories, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

20.     Plaintiff Jimmy Arriaga is a resident of Wilmington, Delaware. In January 2021, he acquired a DreamStation CPAP machine to treat sleep apnea and has purchased a replacement mask. He would not have acquired the device had he known it was defective. He wants a refund, as with all of the Plaintiffs the economic losses associated with any costs spent on a replacement device and accessories, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

21.     Plaintiff Charles Pinck resides in Washington, D.C. In or around June 2020, Plaintiff acquired a Philips DreamStation to treat sleep apnea. Plaintiff Pinck has experienced tinnitus, congestion, and sinus infections. Plaintiff Pinck would not have obtained the device if he had known it was defective. Plaintiff Pinck wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

22.     Plaintiff Iman Jones resides in Jacksonville, Florida. She acquired a DreamStation CPAP to treat sleep apnea. She would not have obtained the device if she had known it was defective. She wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

23.     Plaintiff Walter Coggeshall resides in McDonough, Georgia. He obtained a DreamStation AutoCPAP to treat sleep apnea. Since using his device, he has suffered severe nasal congestion, and in 2020, experienced that he could not breathe through his nose at all. In November 2020, Mr. Coggeshall had to have sinus surgery to be able to breathe through his nose again. He would not have acquired the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

24.     Plaintiff Yolanda Stark resides in Atlanta, Georgia. She obtained a DreamStation to treat sleep apnea. Since using her device, she has been experiencing chest pains and has been admitted to the hospital on one occasion as a result. She would not have acquired the device if she had known it was defective. She wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

25.     Plaintiff Chris Brown resides in Kapolei, Hawaii. Plaintiff Brown obtained a DreamStation CPAP to treat sleep apnea. Plaintiff Brown would not have acquired the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

26.     Plaintiff Adam Hale resides in Pocatello, Idaho. He obtained a Dream Station ASV to treat apnea. He would not have acquired the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

27.     Plaintiff Allen Smock resides in Palos Hills, Illinois. He obtained a DreamStation CPAP with humidifier to treat sleep apnea. Since using his device, Mr. Smock has been experiencing severe congestion. The device requires frequent refills of the reservoir and emits a burning smell. This is causing him to lose sleep. Like all of the Plaintiffs, he is concerned about the long term health effects that may arise as a result of his using the device. He would not have acquired the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

28.     Plaintiff Carlos Oldigs resides in Winnebago County, Illinois. Plaintiff Oldigs acquired a DreamStation BiPAP ASV device for sleep apnea in 2018, and to date has paid $2,705.83 for his device. Plaintiff, like many of the Plaintiffs, has paid out of pocket for replacement filters, masks, and cushions related to his device. Plaintiff Oldigs would not have obtained the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

29.     Plaintiff Robert Schuckit resides in Carmel, Indiana. Mr. Schuckit obtained a DreamStation Auto CPAP with humidifier, and a cellular modem, model no. DSX500H11C, serial no. J192858140274, to treat his sleep apnea. Mr. Schuckit would not have obtained the device if he had known it was defective. Mr. Schuckit wants a refund, replacement with a non-defective

9

device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

30.      Plaintiff Steve Abarr resides in Johnston, Iowa. Plaintiff Abarr has obtained a SyatemOne and DreamStation BiPAP machines to treat sleep apnea. Plaintiff Abarr has been diagnosed with severe chronic asthma. Plaintiff would not have acquired the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

31.      Plaintiff Andrew Fisher resides in Overland Park, Kansas. He obtained a Dream Station Auto CPAP, Model Number DNX500H11C, Serial Number J252878809174, to treat sleep apnea. He has been experiencing sinus issues since using his device. He would not have acquired the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

32.      Plaintiff Mia Coleman resides in Louisville, Kentucky. She obtained a DreamStation CPAP with humidifier to treat sleep apnea. She would not have acquired the device if she had known it was defective. She wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

33.      Plaintiff Paul Miyahira resides in West Monroe, Louisiana. He obtained a DreamStation to treat sleep apnea. He has been experiencing issues with his breathing since using the device. He would not have acquired the device if he had known it was defective. He wants a

refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

34.     Plaintiff Philip Bean resides in Yarmouth, Maine. Plaintiff Bean acquired a DreamStation CPAP to treat sleep apnea. Plaintiff Bean has experienced a recurrent cough. Plaintiff Bean would not have obtained the device if he had known it was defective. Plaintiff Bean wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

35.     Plaintiff Jules Labonte resides in Silver Spring, Maryland. Plaintiff acquired a DreamStation BiPAP, Serial Number J234305865BC7, in 2019 to treat severe sleep apnea. Since using his device, Mr. Labonte has suffered from respiratory irritations including consistent and chronic coughing and throat soreness. He would often notice a weird taste in his mouth while using his device. He would not have obtained the device if he had known it was defective. He wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

36.     Plaintiff Robert McClay resides in Bridgewater, Massachusetts. Plaintiff McClay acquired a Philips DreamStation ASV BiPAP machine, Model No. DSX700S11, Serial No. J26177200E221, to treat his sleep apnea in September 2020. Previously, in 2014, Mr. McClay purchased a SystemOne - Model No. DS6TFLG, Serial No. P09266338 0C60. Plaintiff McClay would not have obtained the devices if  he  had known they were defective. Plaintiff McClay sent Defendants a demand letter seeking remedies under Mass. Gen. Laws Chapter 93A more than 30 days ago. He seeks a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

37.     Plaintiff Lisa Brown resides in Jackson, Michigan. Plaintiff Brown obtained a DreamStation Auto CPAP to treat sleep apnea. Plaintiff Brown would not have acquired the device if she had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

38.     Plaintiff Julie Longway resides in Lowell, Michigan. Plaintiff obtained a Philips Dream Station to treat severe sleep apnea. Plaintiff would not have acquired the device if she had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

39.     Plaintiff Tawnya Porter resides in International Falls, Minnesota. Plaintiff Porter obtained a Philips SystemOne to treat sleep apnea. Plaintiff would not have acquired the device if she had known it was defective. Plaintiff Porter wants a refund, a replacement device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

40.     Plaintiff Forrest Stafford resides in Coila, Mississippi. In 2018, Plaintiff Stafford obtained a DreamStation CPAP to treat sleep apnea. Plaintiff has since developed sinus issues, tinnitus, and headaches. Plaintiff Stafford would not have acquired the device if he had known it was defective. Plaintiff Stafford wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

41.     Plaintiff Delores Brown resides in Kansas City, Missouri. In 2020, Plaintiff Brown obtained a DreamStation Auto CPAP to treat sleep apnea. Plaintiff Brown has since developed a

consistent cough. Plaintiff Brown would not have acquired the device if she had known it was defective. Plaintiff Brown wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

42.     Plaintiff Donald Basemore is a retired veteran who resides in an assisted living facility in St Louis, Missouri. He was diagnosed with sleep apnea and obtained a DreamStation CPAP machine through the Veterans Administration. Like all the Plaintiffs, he would not have accepted this product if he had known it was defective, contained a carcinogenic byproduct, and would be subject to a recall for containing defective materials. Plaintiff Basemore wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

43.     Plaintiff William Worman resides in Broadus, Montana. In or around October 2020, Plaintiff acquired a DreamStation Machine to treat sleep apnea. Plaintiff would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

44.     Plaintiff Christopher Glaub resides in Lincoln, Nebraska. Christopher Glaub acquired a Philips REMStar Pro to treat sleep apnea and since has experienced shortness of breath. Plaintiff Glaub would not have obtained the device if he had known it was defective. Plaintiff Glaub wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

45.     Plaintiff John Poland resides in Las Vegas, Nevada. In or around August 2018, Plaintiff acquired a DreamStation to treat sleep apnea, and since the has experienced headaches, scarring of the lungs, dizziness, fatigue, hypertension, coughing, loss of enjoyment of life, and trouble breathing. Plaintiff Poland would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

46.     Plaintiff Robert McNulty resides in Reno, Nevada. In or around July 2020, Plaintiff McNulty acquired a DreamStation CPAP Machine to treat sleep apnea. Plaintiff Mcnulty would not have obtained the device if he had known it was defective. Plaintiff McNulty wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

47.     Plaintiff John Burlison resides in Henderson, Nevada. He is a retired college dean now working as a real estate broker. He was diagnosed with obstructive sleep apnea in late 2019 and purchased a DreamStation in early 2020. Like all of the Plaintiffs, he would not have purchased this product if he had known it was defective, contained a carcinogenic byproduct, and would be subject to a recall for containing defective materials. Upon learning of the recall, and after consulting with his physician, Mr. Burlison stopped using the DreamStation and purchased a replacement CPAP machine for approximately $1,400.00. His health insurance company would not pay for any part of the replacement machine, Plaintiff Burlison wants a refund, economic losses associated with the replacement of his defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

48.     Plaintiff William Vlahos resides in Salem, New Hampshire. In or around October 2018, Plaintiff Vlahos acquired a Philips DreamStation CPAP to treat sleep apnea. Plaintiff Vlahos would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

49.     Plaintiff Elaine Lizotte resides in Hudson, New Hampshire. In or around June 2018 Elaine Lizotte acquired a DreamStation CPAP machine to treat sleep apnea. Plaintiff Lizotte would not have obtained the device if she had known it was defective. In July 2021, Plaintiff Lizotte purchased a machine from another manufacturer costing over $800. Plaintiff Lizotte wants a refund, economic losses associated with the replacement of the defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

50.     Plaintiff Joseph Ryan resides in West Berlin, New Jersey. In or around July 2018, Plaintiff Ryan acquired a DreamStation CPAP to treat sleep apnea. Plaintiff Ryan would not have obtained the device if he had known it was defective. Plaintiff recently purchased a replacement machine. Plaintiff Ryan wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

51.     Plaintiff Gary Jacobs resides in Marlton, New Jersey. In 2018, Plaintiff Jacobs acquired a DreamStation CPAP to treat sleep apnea, and like many of the Plaintiffs, purchased masks and filters while using the machine. Plaintiff Jacobs would not have obtained the device if he had known it was defective. Plaintiff Jacobs wants a refund, replacement with a non-defective

device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

52.     Plaintiff Jo Dawn Ward resides in Edgeworth, New Mexico. Plaintiff Ward obtained a DreamStation ASV, and since then has experienced and suffered from headaches, nausea, vomiting, and a lump in her throat. Plaintiff would not have acquired the device if she had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

53.     Plaintiff Myron Fields resides in Aztec, New Mexico. In or around April 2019, he acquired a DreamStation to treat apnea. He would not have obtained the device if he had known it was defective. Plaintiff Fields wants a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

54.     Plaintiff Carl Gold resides in Highland Mills, New York. In or around August 2020, Plaintiff Gold acquired a Phillips DreamStation to treat sleep apnea, and since then has experienced headaches, coughing, and trouble sleeping. Plaintiff would not have acquired the device if he had known it was defective. Plaintiff Gold purchased a replacement device from a different manufacturer, paying approximately $912.00. Plaintiff's insurance refused to cover the cost of the replacement machine. Plaintiff Gold wants a refund, economic losses related to the replacement of his defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

55.     Plaintiff Angela Scunziano resides in Smithtown, New York. In 2020, Angela Scunziano acquired a DreamStation to treat sleep apnea and since then has experienced dry mouth

16

and throat, coughing, dry and teary eyes, stomach aches, nausea, vomiting, frequent and recurring headaches, and irritation in her throat and sinuses. Plaintiff Scunziano would not have obtained the device if she had known it was defective. Plaintiff Scunziano wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

56.     Plaintiff Tony Jones resides in Reidsville, North Carolina. In or around July 2014, Plaintiff Jones obtained a RemStar machine to treat sleep apnea. Plaintiff Jones would not have acquired the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

57.     Plaintiff Heath Byers resides in Dickinson, North Dakota. Plaintiff Byers acquired a System One device to treat sleep apnea. Plaintiff Byers would not have obtained and used the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

58.     Plaintiff Matthew Ward resides in Hilliard, Ohio. Plaintiff obtained a Philips DreamStation to treat sleep apnea and since then has experienced fatigue, headaches, congestion, trouble breathing, and inflamed sinuses. Plaintiff Ward would not have acquired the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

59.     Plaintiff Chad Wells resides in Wanette, Oklahoma. Chad Wells acquired a Philips SystemOne BiPAP to treat sleep apnea and since then has experienced asthma and wheezing.

Plaintiff Wells would not have obtained the device if he had known it was defective. Plaintiff Wells wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

60.     Plaintiff Adam Mclean resides in Seaside, Oregon. In or around June 2021, Adam Mclean purchased a DreamStation BiPAP to treat sleep apnea. Plaintiff Mclean would not have purchased the device if he had known it was defective.  Plaintiff wants a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

61.     Plaintiff Lynn Ann Koenck resides in Pottstown, Pennsylvania. In or around October 2019, Plaintiff Koenck acquired a Philips DreamStation CPAP to treat sleep apnea. Plaintiff Koenck would not have obtained the device if she  had known it was defective. Plaintiff Koenck wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

62.     Plaintiff Antonio Perez Bonano resides in San Juan, Puerto Rico.  In or around April 2019, Plaintiff Bonano acquired a DreamStation Auto CPAP to treat sleep apnea and since then has experienced headaches, dry mouth, cough, upper airway irritation, and eye irritation. Plaintiff Bonano would not have obtained the device if he had known it was defective. Plaintiff Bonano wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

63.     Plaintiff Diane Lamontagne resides in Cumberland, Rhode Island. Plaintiff Lamontagne acquired a DreamStation CPAP to treat obstructive sleep apnea and since then has

suffered from several sinus infections. Plaintiff would not have acquired the device if she had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

64.     Plaintiff Harris Jenkins resides in Moncks Corner, South Carolina. Plantiff obtained a RemStar Plus in 2018 and is currently suffering from headaches and a racing heartbeat. Plaintiff Jenkins would not have purchased the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

65.     Plaintiff Vicki Chambers resides in Bluffton, South Carolina. Plaintiff Chambers acquired a DreamStation BiPAP machine to treat sleep apnea and since then has experienced bronco spasms and could not inhale or exhale with the machine. Plaintiff Chambers also noticed an odor that smelled like a burnt chemical in the machine. Plaintiff Chambers would not have obtained the device if she had known it was defective. Plaintiff Chambers wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

66.     Plaintiff Murray Craig resides in Camden, Tennessee. In or around June 2018, Murray Craig acquired a DreamStation CPAP to treat sleep apnea and since then has suffered from headaches, dizziness, nausea, and coughing. Plaintiff Craig would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

67.     Plaintiff Eugene Wohlfarth resides in Lockhart, Texas. Plaintiff Wohlfarth acquired a Philips DreamStation CPAP to treat obstructive sleep apnea. Plaintiff would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

68.     Plaintiff Benedict Nagy, Jr. resides in Enterprise, Utah. Plaintiff Nagy acquired a Philips SystemOne to treat sleep apnea (along with various accessories like masks and hoses), and since then has suffered from sinus infections, nasal polyps, and difficulty breathing. Plaintiff would not have obtained the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

69.     Plaintiff David Joseph Martin resides in Island Pond, Vermont. Plaintiff Martin acquired a DreamStation CPAP to treat sleep apnea and later developed headaches, nosebleeds, and congestion from using the CPAP. Plaintiff Martin would not have obtained the device if he had known it was defective. Plaintiff Martin wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

70.     Plaintiff Cameron Rose resides in Richmond, Virginia. In 2018, Plaintiff Rose acquired a Philips DreamStation CPAP to treat sleep apnea. Plaintiff Rose would not have obtained the device if he had known it was defective. Plaintiff Rose wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

71.     Plaintiff David Gorris is disabled and resides in Richmond, Virginia. In 2020, he was diagnosed with obstructive sleep apnea and acquired a DreamStation. Like all the Plaintiffs, he would not have obtained this product if he had known it was defective, contained a carcinogenic byproduct, and would be subject to a recall for containing defective materials. Plaintiff Gorris wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

72.     Plaintiff Jose Lopez resides in Vancouver, Washington. In or around October 2019, Jose Lopez acquired a Philips DreamStation AutoCPAP to treat sleep apnea, and since then has suffered from a cough after using the recalled device. Plaintiff Lopez would not have obtained the device if Plaintiff Lopez had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

73.     Plaintiff David Bays resides in Alum Creek, West Virginia. In 2020, Plaintiff Bays obtained a DreamStation CPAP to treat sleep apnea. Plaintiff would not have acquired the device if he had known it was defective. Plaintiff wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

74.     Plaintiff Paul Dunn resides in Charleston, West Virginia. Plaintiff Dunn purchased a Philips Dreamstation CPAP machine to treat sleep apnea and other breathing difficulties. Plaintiff Dunn would not have purchased the device if he had known it was defective. Plaintiff Dunn sought a replacement machine from Philips and was told he would have to pay $300 for a loaned machine, and that he could no longer use his existing machine. Plaintiff Dunn paid Philips $300 for a replacement machine. Plaintiff Dunn wants a refund, all economic losses related to the

replacement of his defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

75.     Plaintiff Duane Alt resides in Prairie Du Sac, Wisconsin. Plaintiff Alt obtained a SystemOne CPAP to treat sleep apnea and since then has experienced headaches. Plaintiff Alt would not have acquired the device if he had known it was defective. Plaintiff Alt wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

76.     Plaintiff Rachael DiMaio resides in Cheyenne, Wyoming. She acquired a SystemOne CPAP machine and in 2020 obtained a DreamStation CPAP to treat sleep apnea. Plaintiff DiMaio would not have obtained the devices had she known they were defective. She wants a refund, replacement with a non-defective device, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective device.

**B.     DEFENDANTS**

77.     Koninklijke Philips N.V. is a Dutch multinational company headquartered in Amsterdam, Netherlands, and is the parent company of Philips North America LLC and Philips RS North America LLC.

78.     Defendant Philips North America LLC is a Delaware company with its principal place of business in Cambridge, Massachusetts.

79.     Defendant Philips RS North America LLC (formerly Respironics, Inc.) is a Delaware company headquartered in Pittsburgh, Pennsylvania.

80.     At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other, and all references to "Philips," "Defendant," or "Defendants" herein refers to each and every Defendant individually and collectively.

### III.   JURISDICTION AND VENUE

81.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiff and some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

82.     Venue is proper in this District because Philips North America LLC is headquartered in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### IV.   FACTUAL ALLEGATIONS

### A.   CPAP AND BIPAP MACHINES AND VENTILATORS TREAT SERIOUS CONDITIONS.

83.     Sleep apnea is a sleeping disorder in which breathing is disturbed temporarily during sleep. Breathing may stop or become very shallow. These disturbances are called "apneas."

84.     According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

85.     Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This in turn lowers the oxygen level in the blood, which causes the brain to briefly wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and it may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, all night, and can prevent the patient from reaching the deep, restful phases of sleep.

23

86.     Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing temporarily, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

87.     Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea.

88.     Sleep apnea is a serious medical condition that can cause daytime fatigue, high blood pressure or heart problems, stroke, type 2 diabetes, metabolic syndrome, complications with medications and surgery, liver problems, snoring or other noises during sleep, and other medical ailments.

89.     CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea.

90.     Other therapies to treat sleep apnea include BiPAP and Automatic Positive Airway Pressure (APAP). BiPAP machines use two different pressures, one for inhaling and one for exhaling. APAP machines adjust pressure automatically throughout the night to the patient's pressure needs, for example, in response to changed sleeping positions or different sleep stages. Not every therapy is appropriate for every patient. Many patients respond well to one treatment and not others.

91.     Patients usually place the CPAP, BiPAP, or APAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep.

92.     Patients who use CPAP or BiPAP machines typically must use them every day when they sleep. Symptoms may return quickly if therapy is discontinued.

93.     Respiratory failure is a condition in which a patient has difficulty breathing or getting enough oxygen into the blood. Many underlying conditions can cause respiratory failure, including physical trauma, sepsis, pneumonia, COVID-19, and drug overdose. Respiratory failure can be fatal.

94.     Mechanical ventilators, usually called "ventilators," are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and is inserted through the patient's nose or mouth into the trachea on the other end. Patients are usually sedated while on ventilation because it can otherwise cause intense pain.

95.     Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. Ventilators intended for home use also exist.

96.     The COVID-19 crisis has led to a significant increase in the demand for ventilators because severe COVID-19 can cause sufficient damage to the lungs that patients have difficulty breathing on their own and thus require a ventilator.

**B.      PHILIPS SELLS CPAP AND BIPAP MACHINES AND VENTILATORS CONTAINING PE-PUR FOAM.**

97.     Philips manufactures and sells CPAP machines, BiPAP machines, and ventilators, among other products. According to Philips's 2020 Annual Report,[4] Sleep & Respiratory Care constituted 49% of Philips's total sales in its Connected Care line of business, which in turn accounted for 28% of Philips's overall sales of about €19.535 billion. Philips has sold millions of CPAP and BiPAP machines and ventilators in the United States.

---

[4]https://www.results.philips.com/publications/ar20/downloads/pdf/en/PhilipsFullAnnualReport20 20-English.pdf?v=20210531142942.

98.     Philips's flagship CPAP/BiPAP machine product family is the DreamStation family, including the original DreamStation, launched in October 2015, and the DreamStation Go (a travel version). Philips sells DreamStation products through its subsidiary, Respironics, which Philips acquired in 2008 and is now known as Philips RS North America LLC. The user manual for the DreamStation products is marked with a copyright notice indicating that Koninklijke Philips, N.V. owns the copyright to the manual.

99.     Philips markets the recalled DreamStation products under an approval from the FDA. Philips submitted premarket notification of intent to market medical devices under Section 510(k) of the Federal Food, Drug, and Cosmetic Act. Based on Philips's submission, the FDA "determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA)."

100.     Under this regulatory framework, the devices did not have to undergo a detailed review for safety and efficacy.

101.     The FDA classifies medical devices as Class I, II, or III, based on the risk to the patient, the intended use, and the indications for use. Class I devices are the lowest risk and Class III devices are the highest risk. The FDA classified the DreamStation products as Class II devices. Other recalled products (listed below) are Class II or Class III devices.

102.     Many of Philips's CPAP and BiPAP machines and ventilators contain PE-PUR foam for sound abatement. Polyurethane is an organic polymer in which urethane groups connect the molecular units, and it is usually formed by reacting a diisocyanate or triisocyanate with a

polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate as well.

103.    The two main types of polyurethane are polyester and polyether. Polyester polyurethane has much better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

104.    The recalled devices contain polyester polyurethane foam for sound dampening.

105.    In the DreamStation, for example, there is a channel that surrounds the central fan in the device. This channel is stuffed with PE-PUR foam to absorb the noise from the device while the patient is sleeping. Air passes through this channel, and thus through the PE-PUR foam, before it enters the fan and is pumped into the patient's airway.

106.    Philips advertises itself as a trusted brand and "global leader in the sleep and respiratory markets."[5] Its branding promises consumers that they will "[b]reath easier, sleep more naturally[.]"[6] Philips further assures consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing exceptional therapy," among other things. And it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.[7]

107.    Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians."[8] The machines routinely cost from seven or eight hundred dollars to thousands of dollars per machine.

---

[5] *See* http://www.respironics.com/us_en.
[6] http://www.respironics.com/product_library.
[7] https://www.usa.philips.com/healthcare/solutions/sleep.
[8] *See* https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (citing 2016 Philips survey).

C.   **PHILIPS RECALLED ITS PE-PUR FOAM-CONTAINING MACHINES DUE TO SERIOUS HEALTH HAZARDS THAT THEY CAUSE.**

108.    On April 13, 2021, Philips announced that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family.

109.    Less than two weeks later, on April 26, 2021, Philips announced that its previous generation products posed serious health risks to users and, in the same release, started trying to convince consumers to purchase its latest generation device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.

110.    On June 14, 2021, Philips issued a further announcement, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

> Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.

111.    Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family." Philips elaborated:

28

Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:

For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.

112.    The recalled products ("Recalled Products") are:

- E30

- DreamStation ASV

- DreamStation ST, AVAPS

- SystemOne ASV4

- C Series ASV, S/T, AVAPs

- OmniLab Advanced Plus

- SystemOne (Q Series)

29

- DreamStation CPAP, Auto CPAP, BiPAP

- DreamStation Go CPAP, APAP

- Dorma 400, 500 CPAP

- REMStar SE Auto CPAP

- Trilogy 100 and 200

- Garbin Plus, Aeris, LifeVent

- A-Series BiPAP Hybrid A30

- A-Series BiPAP V30 Auto

- A-Series BiPAP A40

- A-Series BiPAP A30

113.     The recall notice stated that "Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam."

114.     Philips explained: "Based on Philips [*sic*] analysis, the root cause of this issue is related to the sound abatement foam currently used in specific identified products of the Sleep & Respiratory Care portfolio."

115.     On the same day, Philips provided additional information in an announcement entitled "Clinical information for physicians," that explained that the foam breakdown "may lead to patient harm and impact clinical care." It adds:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

116.    The announcement detailed two types of hazards from the foam in the devices.

First, the announcement described dangers due to foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> - Toluene Diamine
>
> - Toluene Diisocyanate
>
> - Diethylene glycol

117.    Millions of patients across the United States, including all of the Named Plaintiffs, used and trusted the Recalled Products on a nightly basis while they slept. Philips has now revealed that the PE-PUR foam in their breathing machines degraded in Defendants' devices and the poisonous particles were aspirated by these patients.

118.    The fact that the patients breathed in toxic and poisonous chemicals is not reasonably in dispute. According to the Report on Carcinogens, Fourteenth Edition, by the National Toxicology Program in the United State Department of Health and Human Services, toluene diisocyanates are reasonably anticipated to be human carcinogens based on sufficient evidence of carcinogenicity from studies in experimental animals. Administration of commercial-grade toluene diisocyanate (analyzed as 85% 2,4 isomer and 15% 2,6 isomer) by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign

tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels (hemangioma and hemangiosarcoma) in female mice.

119.    The Report also notes that toluene diisocyanates are used primarily to manufacture flexible polyurethane foams for use in furniture, bedding, and automotive and airline seats. The foam in Philips's recalled products is flexible polyurethane foam.

120.    The European Union considers toluene diisocyanate "highly toxic" and has concluded that toluene diamine "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs on a nighly basis for many hours each night.

121.    Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." The PE-PUR foam is black, and when it breaks down, it can release black particles.

122.    The second hazard is the possibility of VOCs, that is, chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-

123.    Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or

reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."

124.    Corroborating the dangerous nature of the Recalled Products, on July 22, 2021, the FDA upgraded Philips's recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death."

125.    As noted herein, Philips has admitted that the Recalled Products are defective and unsafe. The Recalled Products are therefore worthless and certainly have a far lesser value (zero) than what customers paid and would not have been purchased by patients if they were informed of the defect at the time of sale.

126.    The purity of the air coming from a breathing device to a patient is highly important and material to a typical patient. Philips advertises the filtration systems in its devices, for example, noting them on a diagram in its DreamStation Family Brochure.[9] Philips's filtration system, however, does not filter out the particles and VOCs described above.

127.    Plaintiffs and the Class have suffered injuries as a result of their purchase of the Recalled Products, including substantial economic losses related to their purchase of the Recalled Products and accessories, and replacement machines and accessories, personal injuries, exposure

---

[9]
https://www.documents.philips.com/assets/20180205/15ef65ad106d4ddc88fca87e0134dc60.pdf?_gl=1*1l6jo9f*_ga*MTM1OTI5NDM5Ny4xNjIzODE3MzMz*_ga_2NMXNNS6LE*MTYyNjkxMDEyNC4yMi4xLjE2MjY5MTQyNTkuMjc.&_ga=2.220564312.1106063144.1626914226-1359294397.1623817333.

to the toxic foam, and the accompanying need for medical monitoring costs, and losses from not being able to use their machines, including wage loss and other consequential damages.

**D.    PHILIPS HAS KNOWN ABOUT THE PE-PUR FOAM PROBLEMS FOR YEARS.**

128.    Although Philips did not disclose these health risks until June 2021, Philips knew about these health risks well beforehand. As discussed above, when Philips announced the recall, Philips also announced that it had received "several complaints" regarding black particles or debris in the airpath circuit. The DreamStation has been on the market since 2015, and several of the affected models have been on the market even longer.

129.    Nick Dunn, who runs the YouTube channel "CPAP Reviews," reported as soon as the recall was announced that he had known about the foam issues for several years because he monitors message boards and social media about CPAP machines. It can be reasonably assumed that Philips, like most companies, closely monitored the Internet concerning its products, and heard about foam breakdown and black particles in the machines soon after launch, if not earlier. It can also be reasonably assumed that Philips conducted its own internal studies of its breathing machines and conducted tests and analysis of them that revealed the problems.

130.    Message boards still contain many posts about black particles inside or on the filters of the DreamStation and other recalled devices. The following list is provided for illustration.

131.    In 2018, the user "trickyneedsleep" reported on apneaboard.com that, using the DreamStation Auto, the filters turned black within three days of use.

132.    In 2019, the user "WSHenry" reported on apneaboard.com in a thread entitled "DreamStation Filter Contamination" that "both the pollen and ultra-fine filters in my machine were clogged with black (Carbon?) particles. I also noted that water chamber was completely dry. There were odd odors noted, and the water chamber was undamaged." He explained that he had

recently cleaned the filters and that "[t]here was only a small amount of dust on the furniture, and the machine and tubing is clean. I do not burn candles nearby, and the furnace is off. I do have the window slightly opened, as is the case nearly year-round." He asked: "Is it possible the contamination is from the blower?"

133.   In 2019, the user "Skogcat1" reported on apneaboard.com in a thread entitled "Black sticky dust in CPAP machine" that, when using the REMStar Auto, there were "sticky black dust particles" in the humidifier chamber.

134.   In September 2020, Carol Nickerson posted on Facebook that she found a black mold-like substance in the water reservoir of her Philips DreamStation. She reported that she cleaned the tubing, mask, and reservoir every week and emptied the reservoir daily, and that she lived in a low-humidity environment in Arizona.

135.   In June 2021, shortly after the recall was announced, on a Reddit thread entitled "Dreamstation Foam," user "BOSSHOG999" posted: "I was wondering what the hell those black particles were in my tube."

136.   Many of the reports of black particles, dust, or mold in the machines are likely due to the breakdown and disintegration of the defective and poisonous PE-PUR foam in the machines, and it is implausible that Philips, the manufacturer and seller of the machines, was not aware of the complaints and reports.

137.   Also, every Philips breathing assistance device since 2009 uses PE-PUR foam, but the DreamStation 2 does not. The implication is clear, and strongly demonstrates that Philips knew that PE-PUR foam was dangerous when it was designing the DreamStation 2, and designed a new product that did not use it.

138.    Discovery in this case will pinpoint the exact time when Philips first learned of the potential problems with the poisonous PE-PUR foam that it used in its breathing machines. For example, Philips knew about the foam problems from its own testing of its own products. Companies that manufacturer medical devices certainly perform some testing on the devices before they market them to the public, even if the device is not of the type for which the FDA requires a full demonstration of safety and efficacy.

139.    Philips advertises the results of various tests of its products, demonstrating that it tested them in some ways before marketing. For example, Philips advertises that the DreamStation is 63% quieter than a competing product, the ResMed AirSense 10, and is barely louder than a whisper.[10] This relative quietness is in part due to the noise-reducing PE-PUR foam. It is likely that Philips performed many other tests on the PE-PUR foam and uncovered the problems that led to the recall long before the recall.

E.    **PHILIPS HAS NOT REPLACED THE RECALLED DEVICES AND DOES NOT PLAN TO DO SO IN THE NEAR FUTURE.**

140.    Philips's CEO, Frans van Houten, stated in the recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."

141.    But Philips's "recall" is a "recall" in name only, and does not actually provide patients with new CPAP, BiPAP, or ventilator devices. As Philips's June 14, 2021 announcement explains:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already

---

10

https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf.

begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.

142.    In reality, patients may register their device with Philips for the recall, but Philips is not currently replacing the defective PE-PUR foam. Nor has Philips provided a timeframe during which it anticipates replacing the defective PE-PUR foam, and it may take a year or more to provide replacements or repairs.

143.    Additionally, due to the design of the devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Nor is replacement foam readily available for self-service repairs.

144.    But patients need to use their breathing machines every day or else their symptoms—which can be severe and life-altering—may return.

145.    As a result, the recall leaves patients without safe, free options. Instead, patients may simply be forced to buy Philips's next-generation product or a competitor's product—at full price, and indeed, thousands of patients, including some of the Named Plaintiffs, have already done so.

146.    Thus, Philips intends to, and is, simply profiting from its so-called "recall" by selling more of its next generation product, the DreamStation 2, to affected patients. It appears that Philips intentionally timed the "recall" to coincide with the launch of the DreamStation 2.

147.    In its recall announcement, Philips estimated that "the full year comparable sales growth and Adjusted EBITA margin guidance provided on April 26, 2021 remains unchanged." In other words, Philips was stating that it did not expect the recall to impact its bottom line at all.

148.    Philips has advised that users should use in-hose filters as a stopgap measure and many users have purchased such filters. There is no proof that the filters are effective, and, according to the FDA, the filters "will not help to reduce exposure to certain chemicals that may be released from the PE-PUR foam." The filters have to be replaced every couple weeks.

## V.    CLASS ALLEGATIONS

149.    Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and/or 23(b)(3). Specifically, the Class and Subclasses consists of the following:

> 1. **Nationwide Class:** All persons or entities that purchased a Recalled Product not for resale in the United States.
>
> 2. **Alabama Subclass:** All persons or entities that purchased a Recalled Product not for resale in Alabama.
>
> 3. **Alaska Subclass:** All persons or entities that purchased a Recalled Product not for resale in Alaska.
>
> 4. **Arizona Subclass:** All persons or entities that purchased a Recalled Product not for resale in Arizona.
>
> 5. **Arkansas Subclass:** All persons or entities that purchased a Recalled Product not for resale in Arkansas.
>
> 6. **California Subclass:** All persons or entities that purchased a Recalled Product not for resale in California.
>
> 7. **Colorado Subclass:** All persons or entities that purchased a Recalled Product not for resale in Colorado.
>
> 8. **Connecticut Subclass:** All persons or entities that purchased a Recalled Product not for resale in Connecticut.

9. **Delaware Subclass:** All persons or entities that purchased a Recalled Product not for resale in Delaware.

10. **District of Columbia Subclass:** All persons or entities that purchased a Recalled Product not for resale in the District of Columbia.

11. **Florida Subclass:** All persons or entities that purchased a Recalled Product not for resale in Florida.

12. **Georgia Subclass:** All persons or entities that purchased a Recalled Product not for resale in Georgia.

13. **Hawaii Subclass:** All persons or entities that purchased a Recalled Product not for resale in Hawaii.

14. **Idaho Subclass:** All persons or entities that purchased a Recalled Product not for resale in Idaho.

15. **Illinois Subclass:** All persons or entities that purchased a Recalled Product not for resale in Illinois.

16. **Indiana Subclass:** All persons or entities that purchased a Recalled Product not for resale in Indiana.

17. **Iowa Subclass:** All persons or entities that purchased a Recalled Product not for resale in Iowa.

18. **Kansas Subclass:** All persons or entities that purchased a Recalled Product not for resale in Kansas.

19. **Kentucky Subclass:** All persons or entities that purchased a Recalled Product not for resale in Kentucky.

20. **Louisiana Subclass:** All persons or entities that purchased a Recalled Product not for resale in Louisiana.

21. **Maine Subclass:** All persons or entities that purchased a Recalled Product not for resale in Maine.

22. **Maryland Subclass:** All persons or entities that purchased a Recalled Product not for resale in Maryland.

23. **Massachusetts Subclass:** All persons or entities that purchased a Recalled Product not for resale in Massachusetts.

24. **Michigan Subclass:** All persons or entities that purchased a Recalled Product not for resale in Michigan.

25. **Minnesota Subclass:** All persons or entities that purchased a Recalled Product not for resale in Minnesota.

26. **Mississippi Subclass:** All persons or entities that purchased a Recalled Product not for resale in Mississippi.

27. **Missouri Subclass:** All persons or entities that purchased a Recalled Product not for resale in Missouri.

28. **Montana Subclass:** All persons or entities that purchased a Recalled Product not for resale in Montana.

29. **Nebraska Subclass:** All persons or entities that purchased a Recalled Product not for resale in Nebraska.

30. **Nevada Subclass:** All persons or entities that purchased a Recalled Product not for resale in Nevada.

31. **New Hampshire Subclass:** All persons or entities that purchased a Recalled Product not for resale in New Hampshire.

32. **New Jersey:** All persons or entities that purchased a Recalled Product not for resale in New Jersey.

33. **New Mexico Subclass:** All persons or entities that purchased a Recalled Product not for resale in New Mexico.

34. **New York Subclass:** All persons or entities that purchased a Recalled Product not for resale in New York.

35. **North Carolina Subclass:** All persons or entities that purchased a Recalled Product not for resale in North Carolina.

36. **North Dakota Subclass:** All persons or entities that purchased a Recalled Product not for resale in North Dakota.

37. **Ohio Subclass:** All persons or entities that purchased a Recalled Product not for resale in Ohio.

38. **Oklahoma Subclass:** All persons or entities that purchased a Recalled Product not for resale in Oklahoma.

39. **Oregon Subclass:** All persons or entities that purchased a Recalled Product not for resale in Oregon.

40. **Pennsylvania Subclass:** All persons or entities that purchased a Recalled Product not for resale in Pennsylvania.

41. **Puerto Rico Subclass:** All persons or entities that purchased a Recalled Product not for resale in Puerto Rico.

42. **Rhode Island Subclass:** All persons or entities that purchased a Recalled Product not for resale in Rhode Island.

43. **South Carolina Subclass:** All persons or entities that purchased a Recalled Product not for resale in South Carolina.

44. **Tennessee Subclass:** All persons or entities that purchased a Recalled Product not for resale in Tennessee.

45. **Texas Subclass:** All persons or entities that purchased a Recalled Product not for resale in Texas.

46. **Utah Subclass:** All persons or entities that purchased a Recalled Product not for resale in Utah.

47. **Vermont Subclass:** All persons or entities that purchased a Recalled Product not for resale in Vermont.

48. **Virginia Subclass:** All persons or entities that purchased a Recalled Product not for resale in Virginia.

49. **Washington Subclass:** All persons or entities that purchased a Recalled Product not for resale in Washington.

50. **West Virginia Subclass:** All persons or entities that purchased a Recalled Product not for resale in West Virginia.

51. **Wisconsin Subclass:** All persons or entities that purchased a Recalled Product not for resale in Wisconsin.

52. **Wyoming Subclass:** All persons or entities that purchased a Recalled Product not for resale in Wyoming.

150.    The Nationwide Class and Subclasses are collectively referred to herein as the "Class." Excluded from the Class are Defendants and their employees, officers, and directors; and the Judge(s) assigned to this case.

151.    Plaintiffs reserve the right to redefine, modify, or narrow the Class definitions prior to class certification based upon discovery or otherwise.

152.    The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions.

153.    This action has been brought and may be properly maintained as a class action for the following reasons:

a.    Numerosity: Members of the Class are so numerous that their individual joinder is impracticable. The Nationwide Class contains millions of individuals and each Subclass contains thousands of individuals who purchased a Recalled Product not for resale. The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiffs at this time but the Class members are readily ascertainable and can be identified by Defendants' records or records of third parties such as durable medical equipment ("DME") providers.

b.    Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.    Whether Defendants manufactured and sold a defective product;

ii.    Whether Defendants were negligent in selling the Recalled Products;

iii.    Whether Defendants failed to warn consumers regarding the risks of the Recalled Products;

iv.   Whether Defendants violated express or implied warranties in selling the Recalled Products;

v.   Whether Defendants' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

vi.   Whether Defendants were unjustly enriched by the sale of Recalled Products;

vii.   The appropriate nature of class-wide equitable relief; and

viii.   The appropriate measurement of restitution and/or measure of damages to Plaintiffs and members of the Class.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.   Typicality: Plaintiffs' claims are typical of the claims of all members of the Class who purchased the Recalled Products for personal use.

d.   Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

e.   Superiority: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them in particular with respect to their economic losses and medical monitoring. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments.

Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## VI.   EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

154.   The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiffs and their physicians the true risks associated with the Recalled Products.

155.   As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been exposed to the risks and harms set forth herein and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

## VII.   CAUSES OF ACTION

### COUNT 1
### STRICT LIABILITY-FAILURE TO WARN
### On behalf of the Nationwide Class and all Subclasses

156.   Plaintiffs and the Class incorporate by reference all preceding paragraphs.

157.   Under applicable state law, Defendants had a duty to warn Plaintiff and the Class members regarding the defect and true risks associated with the Recalled Products.

158.   Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam.

159.    Defendants had information regarding the true risks but failed to warn Plaintiffs, Class members, and their physicians of the serious health risks caused by use of the Recalled Products.

160.    Despite Defendants' obligation to warn of the serious health risks caused by use of the Recalled Products, Philips instead chose to actively conceal this knowledge.

161.    Plaintiffs and Class members would not have purchased the Recalled Products had they known of the defect and risks of purchasing the Recalled Products.

162.    The defects described in this Class Action Complaint proximately caused Plaintiffs' and Class members' injuries as alleged herein, including, without limitation, economic losses and exposure to materials with toxic and carcinogenic effects resulting in the need for long-term medical monitoring.

163.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT 2
### DESIGN DEFECT STRICT LIABILITY
### On behalf of the Nationwide Class and all Subclasses

164.    Plaintiffs and the Class incorporate by reference all preceding paragraphs.

165.    The design of the Recalled Products by Philips, including but not limited to the design and use of the PE-PUR foam and the placement of the PE-PUR foam within the Recalled Products, was defective and unreasonably dangerous, causing degradation and inhalation of the PE-PUR foam, and resulting in exposure to materials with toxic and carcinogenic effects.

166.    Under applicable state law, Defendants had a duty to design the Recalled Products in a manner reasonably fit, suitable, and safe for their intended purposes. The design of the Recalled Products and the use of the PE-PUR foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

167.    The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are alternative breathing machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestion, such as competitors' machines and Defendants' next-generation Dreamstation machines.

168.    Safer, alternative machines from other manufactures were available that did not suffer from the defects as set forth herein and did not have an unreasonable risk of harm as with the Recalled Products and their unsafe and defective PE-PUR foam.

169.    The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

170.    The Recalled Products did not perform as an ordinary consumer would expect.

171.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

### COUNT 3
### NEGLIGENT FAILURE TO WARN
### On behalf of the Nationwide Class and all Subclasses

172.    Plaintiffs and the Class incorporate by reference all preceding paragraphs.

173.    Under applicable state law, Defendants owed Plaintiffs and Class Members a duty of care and to warn of any risks associated with the Recalled Products. Defendants knew or should have known of the true risks but failed to warn Plaintiffs, Class members, and their doctors.

174.    Defendants' negligent breach of duty caused Plaintiffs and Class members economic damages and exposure to materials with toxic and carcinogenic effects, resulting in the need for long-term medical monitoring, and other injuries in the form of headaches, irritation, inflammation, respiratory issues, and other ailments.

175.    Plaintiffs and Class members would not have purchased the Recalled Products had they known of the serious risks associated with purchasing the Recalled Products.

176. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

**COUNT 4**
**NEGLIGENT DESIGN DEFECT**
**On behalf of the Nationwide Class and all Subclasses**

177. Plaintiffs and the Class incorporate by reference all preceding paragraphs.

178. Defendants negligently designed the Recalled Products. Under applicable state law, Philips owed Plaintiffs and the Class a duty to design the Recalled Products in a reasonable manner. The design of the Recalled Products, including but not limited to design and use of the PE-PUR foam and the placement of the PE-PUR foam within the Recalled Products, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and exposure to materials with toxic and carcinogenic effects.

179. The design of the Recalled Products and the use of the PE-PUR foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

180. The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are other breaching machines available in the market that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestion of toxic substances, such as competitors' breathing machines and Defendants' next-generation Dreamstation machines.

181. Safer, alternative machines from other manufactures were available that did not have an unreasonable risk of harm as with the Recalled Products and their unsafe PE-PUR foam.

182. The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

183. The Recalled Products did not perform as an ordinary consumer would expect.

184. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

**COUNT 5**
**NEGLIGENT RECALL**
**On behalf of the Nationwide Class and all Subclasses**

185.     Plaintiffs and the Class incorporate by reference all preceding paragraphs.

186.     In issuing a voluntary recall, Philips assumed duties to Plaintiff and the Class to exercise reasonable care in issuing and implementing the recall.

187.     Philips breached its duties by failing to adequately warn Plaintiffs and the Class of the dangers associated with the use of the Recalled Products by refusing to promptly refund, repair, or replace the Recalled Products.

188.     As a direct result of Defendants' breach of duty, Plaintiffs and the Class have suffered harm in an amount to be determined at trial.

**COUNT 6**
**BREACH OF EXPRESS WARRANTY**
**On behalf of the Nationwide Class and all Subclasses**

189.     Plaintiffs and the Class incorporate by reference all preceding paragraphs.

190.     Defendants warranted the Recalled Products "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

191.     Defendants breached this express warranty in connection with the sale and distribution of Recalled Products. At the point of sale, the Recalled Products, while appearing normal, contained defects as set forth herein, rendering them unsuitable and unsafe for personal use.

192.     Had Plaintiffs and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

48

193.    Defendants have breached their warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

194.    As a direct and proximate result of Defendants' breach of their express warranty, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

**COUNT 7**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**On behalf of the Nationwide Class and all Subclasses**

195.    Plaintiffs and the Class incorporate by reference all preceding paragraphs.

196.    By operation of law, Defendants, as manufacturers of the Recalled Products and as the providers of a limited warranty for the Recalled Products, impliedly warranted to Plaintiff and the Class that the Recalled Products were of merchantable quality and safe for their ordinary and intended use.

197.    Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Products. At the point of sale, the Recalled Products while appearing normal—contained defects as set forth herein rendering them unsuitable and unsafe for personal use.

198.    Had Plaintiffs and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

199.    Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

200.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

**COUNT 8**
**VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT**
**15 U.S.C. 2301, *et seq*.**
**On behalf of the Nationwide Class and all Subclasses**

201.     Plaintiffs and the Class incorporate by reference all preceding paragraphs.

202.     The Recalled Products constitute "consumer products" as defined in 15 U.S.C. § 2301.

203.     Plaintiffs and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301.

204.     Philips is a "supplier" of the Recalled Products as defined in 15 U.S.C. § 2301.

205.     Philips is a "warrantor[s]" as defined in 15 U.S.C. § 2301.

206.     The warranties made by Philips pertained to consumer products costing the consumer more than five dollars, *see* 15 U.S.C. § 2302(e).

207.     Plaintiffs and the members of the Class invoke federal jurisdiction for the claims stated under this Count pursuant to the Class Action Fairness Act.

208.     The Recalled Products were defective at the time they came off Philips' assembly lines and at all subsequent times (including at the times of sale and/or delivery to Plaintiffs and the members of the Class) because the defective PE-PUR foam and design makes them dangerously unsafe.

209.     As a result, the Recalled Products were worth less (nothing) at the time of their sales than the prices paid for them.

210.    Plaintiffs and the members of the Class would not have purchased or accepted the Recalled Products had they known the machines were defective.

211.    Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the express warranties they made to Plaintiffs and the members of the Class.  Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiffs and the members of the Class.

212.    Plaintiffs and the Class need not have given notice of the defects to Philips and an opportunity for Philips to comply with their warranty obligations prior to the filing of this suit, because Plaintiffs may give such notice to Philips on their own behalf and on behalf of the Class after class certification pursuant to 15 U.S.C. § 2310(e).

213.    Based on the facts alleged herein, any durational limitations to the warranties that would otherwise bar the Magnuson-Moss Federal Warranty Act claims in this Count are procedurally and substantively unconscionable and otherwise unenforceable under federal law and the applicable state common law.

214.    Based on the facts alleged herein, any durational limitation to the warranties that would otherwise bar the claims in this Count are tolled under equitable doctrines.

215.    Plaintiffs and the members of the Class sustained injuries and damages as a proximate result of Philips' violation of its express and implied warranties, and are entitled to legal and equitable relief against Defendants, including economic damages, rescission or other relief as appropriate, including compensatory damages consisting of: (a) the difference between the values of the Recalled Products as warranted (their prices) and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Products, and (c) other miscellaneous incidental and consequential damages.

216.     In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action

**COUNT 9**
**UNJUST ENRICHMENT**
**(In the Alternative)**
**On behalf of the Nationwide Class and all Subclasses**

217.     Plaintiffs and the Class incorporate by reference all preceding paragraphs.

218.     Plaintiffs and the Class members conferred a tangible and material economic benefit upon Defendants by purchasing the Recalled Products. Plaintiffs and Class members would not have purchased the Recalled Products had they known of the defect and true risks of using the Recalled Products, while Defendants cannot and have not provided a timely repair or replacement for the Recalled Products. Under these circumstances, it would be unjust and inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiff and the Class.

219.     Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiffs and the Class members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

220.     Defendants' retention of the benefit conferred upon them by Plaintiff and the Class would be unjust and inequitable.

221.     Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT 10
### Arizona Consumer Fraud Act
### A.R.S. §§ 44-1521, *et seq.*
### On Behalf of the Arizona Subclass

222.    Plaintiffs incorporate by reference all preceding paragraphs.

223.    Plaintiff Laurelann Porter brings this cause of action individually and on behalf of the members of the Arizona Subclass.

224.    The Arizona Consumer Fraud Act prohibits "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged." A.R.S. § 44-1522.

225.    Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Arizona Consumer Fraud Act.

226.    Defendants participated in unfair or deceptive trade practices that violated the Arizona Consumer Fraud Act as described herein. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

227.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

228.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

229.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

230.    Defendants knew or should have known that their conduct violated the Arizona Consumer Fraud Act.

231.    Had Plaintiff Porter and the Arizona Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

232.    Defendants owed Plaintiff and the Arizona Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Arizona Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff Porter and the Arizona Subclass Members that contradicted these representations.

233.    Plaintiff Porter and the Arizona Subclass Members suffered monetary damages as a result of Defendants' conduct.

234.    Defendants' violations present a continuing risk to Plaintiff Porter and the Arizona Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

235.    Defendants are liable to Plaintiff and the Arizona Subclass Members for their damages, punitive damages, attorneys' fees costs.

**COUNT 11**
**Arkansas Deceptive Trade Practices Act**
**Ark. Code Ann. §§ 4-88-101, *et seq.***
**On Behalf of the Arkansas Subclass**

236.    Plaintiffs incorporate by reference all preceding paragraphs.

237.    Plaintiff Melcher brings this cause of action individually and on behalf of the members of the Arkansas Subclass.

238.    The Arkansas Deceptive Trade Practices Act prohibits deceptive and unconscionable trade practices, including, among other things, "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model" or "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107.

239.    The Arkansas Deceptive Trade Practices Act makes it unlawful to engage in "any deception, fraud, or false pretense" or "[t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission" "[w]hen utilized in connection with the sale or advertisement of any goods." Ark. Code Ann. § 4-88-108.

240.    Defendants engaged in unlawful deceptive and unconscionable trade practices, deception, fraud, or false pretense, and the concealment, suppression, or omission of any material fact with intent that others rely upon that concealment, suppression, or omission, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff Melcher and Arkansas Subclass Members, in violation of Ark. Code Ann. §§ 4-88-101, *et seq.*, including by misrepresenting the true quality of the Recalled Products, and concealing the true risks of the Recalled Products.

241.    The above deceptive and unconscionable trade practices or acts by Defendants were conducted in connection with the sale or advertisement of "goods," as defined Ark. Code Ann. § 4-88-102(4).

242.    The above unlawful acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

243.    Defendants' actions were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff Melcher and the Arkansas Subclass members.

244.    Defendants' actions were material to Plaintiff Melcher and Arkansas Subclass members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

245.    As a direct and proximate result of Defendants' unlawful deceptive and unconscionable acts or practices, Plaintiff and Arkansas Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the past, present, and future costs associated with replacement of the Recalled Products and ongoing medical costs and testing.

246.    Plaintiff Melcher and the Arkansas Subclass members seek relief under Ark. Code Ann. § 4-88-113(f)(1)(A), including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT 12**
**California Unfair Competition Law**
**Cal. Civil Code §§ 17200, *et seq.***
**On Behalf of the California Subclass**

247.    Plaintiffs incorporate by reference all preceding paragraphs.

248.    Plaintiffs Bailey and DiJohn bring this cause of action individually and on behalf of the members of the California Subclass.

249.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

250.    The acts and practices of Defendants as alleged herein constitute "unfair" business acts and practices under the UCL in that Defendants conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct.

251.    Defendants have, in the course of their business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by concealing the true risks of the Recalled Products.

252.    These acts also constitute "fraudulent" business acts and practices under the UCL in that Defendants' conduct is false, misleading, and has a tendency to deceive the Class and the general public.

253.    Plaintiffs Bailey and DiJohn and California Subclass Members have suffered injury in fact and have lost money as a result of Defendants' fraudulent business acts or practices.

254.    The unlawful, fraudulent, and unfair business acts or practices described herein present a threat and likelihood of harm and deception to Plaintiffs Bailey and DiJohn and California Subclass Members in that Defendants have systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

255.    Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiffs Bailey and DiJohn and California Subclass Members seek an order providing restitution and

disgorgement of all profits relating to the above-described unfair business acts or practices, and injunctive and declaratory relief as may be appropriate.

256.    Because of their reliance on Defendants' omissions concerning the Recalled Products, Plaintiffs Bailey and DiJohn and California Subclass Members suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

257.    Plaintiffs Bailey and DiJohn and California Subclass Members are reasonable consumers who did not expect the risks inherent with the Recalled Products.

258.    Defendants' conduct in concealing and failing to disclose the true risks of the Recalled Products is unfair in violation of the UCL, because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.

259.    Defendants acted in an immoral, unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.

260.    The gravity of harm resulting from Defendants' unlawful, fraudulent, and unfair conduct outweighs any potential utility. The Recalled Machines present a substantial health risk to consumers and harmed the public at large and is part of a common and uniform course of wrongful conduct.

261.    The harm from Defendants' conduct was not reasonably avoidable by consumers because only Defendants were aware of the true facts concerning the risks of its Recalled Products, and Defendants did not disclose them, despite knowing of such defects. Plaintiffs Bailey and DiJohn and California Subclass Members did not know of and had no reasonable means of discovering the true risk of using the Recalled Products.

262.    Plaintiffs Bailey and DiJohn suffered injury in fact, including lost money or property, as a result of Defendants' unlawful, fraudulent, and unfair acts. Absent Defendants' conduct, Plaintiffs would not have bought the Recalled Products.

263.    Through its unlawful, fraudulent, and unfair conduct, Defendants acquired money that Plaintiffs once owned.

264.    Plaintiffs Bailey and DiJohn and California Subclass Members accordingly seek appropriate relief under the UCL, including (a) restitution in full and (b) such orders or judgments as may be necessary to enjoin Defendants from continuing their unlawful, fraudulent, and unfair practices. Plaintiffs also seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

**COUNT 13**
**Colorado Consumer Protection Act**
**Colo. Rev. Stat. §§ 6-1-101, *et seq.***
**On Behalf of the Colorado Subclass**

265.    Plaintiffs incorporate by reference all preceding paragraphs.

266.    Plaintiff Wilson brings this cause of action individually and on behalf of the members of the Colorado Subclass.

267.    The Colorado Consumer Protection Act prohibits unfair or deceptive acts or practices, including, "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(u). Defendants engaged in deceptive acts or practices that violated the Colorado Consumer Protection Act.

268.    Defendants participated in unfair or deceptive trade practices that violated the Colorado Consumer Protection Act as described below and throughout this Class Action

Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

269.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

270.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

271.   Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

272.   Defendants knew or should have known that their conduct violated the Colorado Consumer Protection Act.

273.   Had Plaintiff Wilson and the Colorado Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

274.   Defendants owed Plaintiff and the Colorado Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Colorado Subclass Members; and/or (c) made incomplete

60

representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff and the Colorado Subclass Members that contradicted these representations.

275.    Plaintiff Wilson and the Colorado Subclass Members suffered monetary damages as a result of Defendants' conduct.

276.    Defendants' violations present a continuing risk to Plaintiff Wilson and the Colorado Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

277.    Defendants are liable to Plaintiff and the Colorado Subclass Members for actual damages sustained.

**COUNT 14**
**Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. §§ 42-110a, *et seq.***
**On Behalf of the Connecticut Subclass**

278.    Plaintiffs incorporate by reference all preceding paragraphs.

279.    Plaintiff Rohan brings this cause of action individually and on behalf of the members of the Connecticut Subclass.

280.    The Connecticut Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110(b)(a).

281.    Defendants participated in unfair or deceptive trade practices that violated the Connecticut Unfair Trade Practices Act as described below and alleged throughout the Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

282.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

283.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

284.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

285.    Defendants knew or should have known that their conduct violated the Connecticut Unfair Trade Practices Act.

286.    Had Plaintiff Rohan and the Connecticut Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

287.    Defendants owed Plaintiff and the Connecticut Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Connecticut Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff and the Connecticut Subclass Members that contradicted these representations.

288.    Plaintiff and the Connecticut Subclass Members suffered monetary damages as a result of Defendants' conduct.

289.    Defendants' violations present a continuing risk to Plaintiff and the Connecticut Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

290.    Defendants are liable to Plaintiff and the Connecticut Subclass Members for actual damages, punitive damages, equitable relief, attorneys' fees and costs.  Conn. Gen. Stat. § 42-110g(a), (d).

291.    A copy of this complaint is being mailed to the Connecticut Attorney General and the Connecticut Commissioner of Consumer Protection.  Conn. Gen. Stat. § 42-110g(d).

**COUNT 15**
**Delaware Consumer Fraud Act**
**Del. Code Ann. § 2511, *et seq.***
**On Behalf of the Delaware Subclass**

292.    Plaintiffs incorporate by reference all preceding paragraphs.

293.    Plaintiff Jimmy Arriaga brings this cause of action individually and on behalf of the members of the Delaware Subclass.

294.    The Delaware Consumer Fraud Act prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise." Del. Code Ann. § 2513.

295.    Defendants participated in unfair or deceptive trade practices that violated the Delaware Consumer Fraud Act as described below and alleged throughout the Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Products.

Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

296.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

297.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

298.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

299.    Defendants knew or should have known that their conduct violated the Delaware Consumer Fraud Act.

300.    Had Plaintiff Arriaga and the Delaware Subclass Members known the truth about the Recalled Products, they would not have obtained the Recalled Products. Plaintiff and the Delaware Subclass did not receive the benefit of their bargain as a result of Defendants' misconduct.

301.    Defendants owed Plaintiff and the Delaware Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Delaware Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff and the Delaware Subclass Members that contradicted these representations.

302.     Plaintiff and the Delaware Subclass Members suffered monetary damages as a result of Defendants' conduct.

303.     Defendants' violations present a continuing risk to Plaintiff and the Delaware Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

304.     Defendants are liable to Plaintiff and the Delaware Subclass Members for all damages sustained.  Del. Code Ann. § 2525.

**COUNT 16**
**District of Columbia Consumer Protection Act,**
**D.C. Code § 28-3901, *et seq.***
**On Behalf of the District of Columbia Subclass**

305.     Plaintiffs incorporate by reference all preceding paragraphs.

306.     Plaintiff Pinck brings this cause of action individually and on behalf of the members of the District of Columbia Subclass.

307.     The D.C. Consumer Protection Act prohibits "unfair or deceptive trade practice[s]." D.C. Code § 28-3904.

308.     Defendants participated in unfair or deceptive trade practices that violated the D.C. Consumer Protection Act as described below and alleged throughout the Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

309.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

310.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

311.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

312.    Defendants knew or should have known that their conduct violated the D.C. Consumer Protection Act.

313.    Had Plaintiff Pinck and the District of Columbia Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiff and District of Columbia Subclass Members did not receive the benefit of their bargain as a result of Defendants' misconduct.

314.    Defendants owed Plaintiff Pinck and the District of Columbia Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the District of Columbia Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff and the District of Columbia Subclass Members that contradicted these representations.

315.    Plaintiff and the District of Columbia Subclass Members suffered monetary damages as a result of Defendants' conduct.

316.    Defendants' violations present a continuing risk to Plaintiff and the District of Columbia Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

317.    Defendants are liable to Plaintiff and the District of Columbia Subclass Members for all damages sustained, treble damages of $1,500, punitive damages, attorneys' fees and costs, and injunctive relief.  D.C. Code § 28-3905(k)(1).

**COUNT 17**
**Florida Deceptive Trade Practices Act,**
**Fla. Stat. Ann. § 501.201, <em>et seq.</em>**
**On Behalf of the Florida Subclass**

318.    Plaintiffs incorporate by reference all preceding paragraphs.

319.    Plaintiff Jones brings this cause of action individually and on behalf of the members of the Florida Subclass.

320.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, <em>et seq.</em>, Florida Statutes ("FDUTPA").

321.    At all relevant times, Plaintiff Jones and the Florida Subclass Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

322.    Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

323.    Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiff and the Florida Subclass Members, acting reasonably under the circumstances, to their detriment. By failing to the true risks of the Recalled Products, Defendant violated FDUTPA.

324.     Defendants failed to reveal facts that were material to Plaintiff Jones and the Florida Subclass Members' decisions to purchase the Recalled Products, and Defendants intended that Plaintiff and the Florida Subclass Members would rely upon the omissions.

325.     Defendants' actions impact the public interest because Plaintiff Jones and the Florida Subclass Members were injured in exactly the same way as thousands of others purchasing Recalled Products as a result of and pursuant to Defendants' generalized course of deception.

326.     Had Plaintiff Jones and the Florida Subclass Members known the truth about the Recalled Products, they would not have purchased and the Recalled Products.

327.     The foregoing acts, omissions and practices proximately caused Plaintiff and the Florida Subclass Members to suffer actual damages with they are entitled to recover such damages, together with attorneys' fees and costs of suit.

**COUNT 18**
**Hawaii Unfair and Deceptive Trade Practices Act,**
**Haw. Rev. Stat. § 480-2, *et seq*.**
**On Behalf of the Hawaii Subclass**

328.     Plaintiffs incorporate by reference all preceding paragraphs.

329.     Plaintiff Chris Brown brings this cause of action individually and on behalf of the members of the Hawaii Subclass.

330.     The Hawaii Unfair and Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2(a).

331.     Defendants participated in unfair or deceptive trade practices that violated the Hawaii Unfair and Deceptive Trade Practices Act as described below and alleged throughout the Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled

Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

332.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

333.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

334.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

335.    Defendants knew or should have known that their conduct violated the Hawaii Unfair and Deceptive Trade Practices Act.

336.    Had Plaintiff Brown and the Hawaii Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

337.    Defendants owed Plaintiff Brown and the Hawaii Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff Brown and the Hawaii Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff Brown and the Hawaii Subclass Members that contradicted these representations.

338.     Plaintiff and the Hawaii Subclass Members suffered monetary damages as a result of Defendants' conduct.

339.     Defendants' violations present a continuing risk to Plaintiff and the Hawaii Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

340.     Defendants are liable to Plaintiff and the Hawaii Subclass Members for actual damages, treble damages, equitable relief, attorneys' fees and costs.  Haw. Rev. Stat. § 480-13.

**COUNT 19**
**Idaho Consumer Protection Act**
**Idaho Code Ann. §§ 48-601, *et seq.***
**On Behalf of the Idaho Subclass**

341.     Plaintiffs incorporate by reference all preceding paragraphs.

342.     Plaintiff Adam Hale brings this cause of action individually and on behalf of the members of the Idaho Subclass.

343.     The purpose of the Idaho Consumer Protection Act is to "protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce." Idaho Code Ann. § 48-601.

344.     The Idaho Consumer Protection Act prohibits methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, including, among other things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" or "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Idaho Code Ann. § 48-603.

345.     Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by

Plaintiff Hale and Idaho Subclass Members, in violation of Idaho Code Ann. §§ 48-601, *et seq.*, including by misrepresenting the true quality of the Recalled Products, and concealing the true risks of the Recalled Products.

346.   The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of "trade" or "commerce" as defined by Idaho Code Ann. § 48-602(2).

347.   The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

348.   Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Hale and the Idaho Subclass members.

349.   Plaintiff Hale and Idaho Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

350.   As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff Hale and Idaho Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

351.   Plaintiff Hale and Idaho Subclass members seek relief under Idaho Code Ann. § 48-608, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, treble damages, civil penalties, and attorneys' fees and costs.

**COUNT 20**
**Illinois Consumer Fraud Act**
**815 ILCS § 505/1, *et seq.***
**On Behalf of the Illinois Subclass**

352.   Plaintiffs incorporate by reference all preceding paragraphs.

353.    Plaintiffs Smock and Oldigs bring this cause of action on their behalf and on behalf of the members of the Illinois Subclass.

354.    Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the products purchased by Plaintiffs Smock and Oldigs and Illinois Subclass Members, in violation of 815 ILCS § 505/2, including by concealing the true risks of the Recalled Products. These injuries outweigh any benefits to consumers or to competition.

355.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

356.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Smock and Oldigs and the Illinois Subclass members.

357.    Plaintiffs Smock and Oldigs and Illinois Subclass members would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known that the Recalled Products were defective

358.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Smock and Oldigs and Illinois Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

359.    Plaintiffs Smock and Oldigs and Illinois Subclass members seek relief under 815 ILCS § 505/10a, including, but not limited to injunctive relief, damages, restitution, punitive damages and attorneys' fees and costs.

360.    A copy of this complaint is being sent to the Illinois Attorney General.  815 ILCS § 505/10d.

**COUNT 21**
**Iowa Consumer Frauds Act**
**Iowa Code §§ 714H, 714.16/**
**On Behalf of the Iowa Subclass**

361.     Plaintiffs incorporate by reference all preceding paragraphs.

362.     Plaintiff Abarr brings this cause of action individually and on behalf of the members of the Iowa Subclass.

363.     The Iowa Consumer Frauds Act prohibits the "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes." Iowa Code § 714H.3.

364.     Defendants participated in unfair or deceptive trade practices that violated the Iowa Consumer Frauds Act as described below and alleged throughout the Complaint.  By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

365.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

366. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

367. Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

368. Defendants knew or should have known that their conduct violated the Iowa Consumer Frauds Act.

369. Had Plaintiff Abarr and the Iowa Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

370. Defendants owed Plaintiff Abarr and the Iowa Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff Abarr and the Iowa Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff and the Iowa Subclass Members that contradicted these representations.

371. Plaintiff Abarr and the Iowa Subclass Members suffered monetary damages and ascertainable losses as a result of Defendants' conduct.

372. Defendants' violations present a continuing risk to Plaintiff Abarr and the Iowa Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

373. Defendants are liable to Plaintiff and the Iowa Subclass Members for actual damages, treble damages, equitable relief, attorneys' fees and costs. Iowa Code § 714H.5.

374.    A copy of this complaint is being sent to the Iowa Attorney General. Iowa Code § 714H.6.

**COUNT 22**
**Kansas Consumer Protection Act**
**Kan. Stat. Ann. §§ 50-623,** *et seq.*
**On Behalf of the Kansas Subclass**

375.    Plaintiffs incorporate by reference all preceding paragraphs.

376.    Plaintiff Fisher brings this cause of action individually and on behalf of the members of the Kansas Subclass.

377.    A key policy purpose of the Kansas Consumer Protection Act, which is to be "construed liberally," is "to protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. § 50-623.

378.    The Kansas Consumer Protection Act prohibits suppliers from engaging in deceptive acts and practices "in connection with a consumer transaction," which include, among other things, (1) representations made knowingly or with reason to know that "[p]roperty or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have," (2) representations made knowingly or with reason to know that "property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation," (3) "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," and (4) "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." Kan. Stat. Ann. § 50-626(b)(1-3).

379.    The Recalled Products purchased by Plaintiff and Kansas Subclass Members are "property" as defined by Kan. Stat. Ann. § 50-624(j).

380.    Defendants are "suppliers" as defined by Kan. Stat. Ann. § 50-624(l).

381.    Defendants engaged in deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Kansas Subclass Members, in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*, including by misrepresenting the true quality of the Recalled Products, and concealing the true risks of the Recalled Products.

382.    The above deceptive acts or practices by Defendants were conducted in connection with "consumer transactions" as defined by Kan. Stat. Ann. § 50-624(c).

383.    The above unlawful deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

384.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Fisher and the Kansas Subclass members.

385.    Plaintiff Fisher and Kansas Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products would be defective.

386.    As a direct and proximate result of Defendants' deceptive acts or practices, Plaintiff Fisher and Kansas Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

387.    Plaintiff and Kansas Subclass members seek relief under by Kan. Stat. Ann. § 50-634, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, civil penalties and attorneys' fees and costs.

### COUNT 23
**Kentucky Consumer Protection Act**
**Kentucky Revised Statutes Annotated §§ 367.110, *et seq.***
**On Behalf of the Kentucky Subclass**

388.    Plaintiffs incorporate by reference all preceding paragraphs.

389.    Plaintiff Coleman brings this cause of action individually and on behalf of the members of the Kentucky Subclass.

390.    The Kentucky Consumer Protection Act was passed after its legislature found that "the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services" and declared unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

391.    Defendants engaged in unfair, false, misleading, or deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Kentucky Subclass Members, in violation of Ky. Rev. Stat. Ann. § 367.170, including by concealing the true risks of the Recalled Products.

392.    The above unfair, false, misleading, or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by Ky. Rev. Stat. Ann. § 367.110(2).

393.    The above unfair, false, misleading, or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

394.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Kentucky Subclass members.

395.    Plaintiff Coleman and Kentucky Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

396.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Coleman and Kentucky Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

397.    Plaintiffs and Kentucky Subclass members seek relief under Kentucky Ky. Rev. Stat. Ann. § 367.220, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 24**
**Louisiana Unfair Trade Practices and Consumer Protection Law**
**La. Rev. Stat. Ann. §§ 51:1401, *et seq.***
**On Behalf of the Louisiana Subclass**

398.    Plaintiffs incorporate by reference all preceding paragraphs.

399.    Plaintiff Miyahira brings this cause of action individually and on behalf of the members of the Louisiana Subclass.

400.    The Louisiana Unfair Trade Practices and Consumer Protection Law makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. §§ 51:1405(A).

401.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff Miyahira and Louisiana Subclass Members, in violation of La. Rev. Stat. Ann. § 51:1405A, including by concealing the true risks of the Recalled Products.

402.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by La. Rev. Stat. Ann. §§ 51:1402(10).

403.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

404.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Miyahira and the Louisiana Subclass members.

405.     Plaintiff Miyahira and Louisiana Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

406.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Miyahira and Louisiana  Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

407.     Plaintiff Miyahira and Louisiana Subclass members seek relief under La. Rev. Stat. Ann. § 51:1409, including, but not limited to damages, treble damages and attorneys' fees and costs.

**COUNT 25**
**Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law §§ 13-101, *et seq*.**
**On Behalf of the Maryland Subclass**

408.     Plaintiffs incorporate by reference all preceding paragraphs.

409.     Plaintiff Labonte brings this cause of action individually and on behalf of the members of the Maryland Subclass.

410.     Under the Maryland Consumer Protection Act, "[a] person may not engage in any unfair, abusive, or deceptive trade practice" in the sale of any consumer goods. Md. Code Ann., Com. Law § 13-303(1).

411.     Under the Maryland Consumer Protection Act, unfair, abusive, or deceptive trade practices include, among other things, representations that consumer goods "have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have" or "are of a particular standard, quality, grade, style, or model which they are not"; "[f]ailure to state a material fact if the failure deceives or tends to deceive; or "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any

79

material fact with the intent that a consumer rely on the same in connection with…[t]he promotion or sale of any consumer goods." Md. Code Ann., Com. Law § 13-301.

412.    Defendants engaged in unfair, abusive, or deceptive trade practices with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Maryland Subclass Members, in violation of Md. Code Ann., Com. Law §§ 13-101, *et seq*., including by knowingly making statements or representations that were false or misleading regarding the quality of the Recalled Products and concealing the true risks of the Recalled Products.

413.    The above unfair, abusive, or deceptive trade practices by Defendants were conducted in connection with the sale of "consumer goods," as defined by Md. Code Ann., Com. Law § 13-101(d)(1).

414.    The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

415.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Labonte and the Maryland Subclass members.

416.    Plaintiff Labonte and Maryland Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

417.    As a direct and proximate result of Defendants' unfair, abusive, or deceptive trade practices, Plaintiff Labonte and Maryland Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

418.    Plaintiff Labonte and Maryland Subclass members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to compensatory damages, and attorneys' fees and costs.

<u>**COUNT 26**</u>
**Massachusetts Consumer Protection Act**
**Mass. Gen. Laws Ann. ch. 93A, §§ 1-11, *et seq*.**
<u>**On Behalf of the Massachusetts Subclass**</u>

419.     Plaintiffs incorporate by reference all preceding paragraphs.

420.     Plaintiff Robert McClay bring this cause of action individually and on behalf of the members of the Massachusetts Subclass.

421.     Under the Massachusetts Consumer Protection Act, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws Ann. ch. 93A, § 2.

422.     Defendants engaged in unfair, abusive, or deceptive trade practices with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs McClay and Massachusetts Subclass Members, including by knowingly making statements or representations that were false or misleading regarding the quality of the Recalled Products, and concealing the true risks of the Recalled Products.

423.     The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

424.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Massachusetts Subclass members.

425.     Plaintiff McClay and Massachusetts Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

426.     As a direct and proximate result of Defendants' unfair, abusive, or deceptive trade practices, Plaintiff McClay and Massachusetts Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

427.     Plaintiff McClay and Massachusetts Subclass members seek relief under Mass. Gen. Laws Ann. ch. 93A, § 2, including, but not limited to injunctive relief, compensatory damages, statutory damages, and attorneys' fees and costs.

**COUNT 27**
**Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.901, _et seq._**
**On Behalf of the Michigan Subclass**

428.     Plaintiffs incorporate by reference all preceding paragraphs.

429.     Plaintiffs Lisa Brown and Julie Longway bring this cause of action individually and on behalf of the members of the Michigan Subclass.

430.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.…" Mich. Comp. Laws § 445.903(1). GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

431.     Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the

Recalled Products purchased by Plaintiffs and Michigan Subclass Members, in violation of Mich. Comp. Laws § 445.903, including by misrepresenting the true quality of the Recalled Products, and concealing the true risks of the Recalled Products.

432.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade or commerce," as defined by Mich. Comp. Laws § 445.902(1)(g).

433.    The above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact.

434.    The representations by Defendants regarding the quality of the Recalled Products was false.

435.    Defendants knew the representations were false or made it recklessly as a positive assertion without knowledge of its truth.

436.    Defendants intended that persons rely on the above misrepresentation regarding the quality of the Recalled Products.

437.    Plaintiffs Brown and Longway and Michigan Subclass members acted in reliance on Defendants' representations.

438.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

439.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Brown and Longway and the Michigan Subclass members.

440.    Plaintiffs and Michigan Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had

they known that the Recalled Products were defective.

441.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Michigan Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

442.    Plaintiffs Brown and Longway and Michigan Subclass members seek relief under Mich. Comp. Laws § 445.911, including, but not limited to injunctive relief, damages, attorneys' fees and costs.

**COUNT 28**
**Minnesota Consumer Fraud Act, Minnesota Unlawful Trade Practices Act, and**
**Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. §§ 325F.69; 325D.13; and 325D.44, respectively**
**On Behalf of the Minnesota Subclass**

443.    Plaintiffs incorporate by reference all preceding paragraphs.

444.    Plaintiff Tawnya Porter brings this cause of action individually and on behalf of the members of the Minnesota Subclass.

445.    The MPCFA makes unlawful "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). The MPCFA further provides that "any person injured by a violation of [the MPCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31(3a).

446.    Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and

Minnesota Subclass Members, in violation of Minn. Stat. §§ 325F.69; 325D.13; and 325D.44, including by misrepresenting the true quality of the Recalled Products and concealing the true risks of the Recalled Products.

447.    The above unfair and deceptive practices and acts by Defendants involved the "sale" of "merchandise," as defined by Minn. Stat. § 325F.68.

448.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

449.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Porter and the Minnesota Subclass members.

450.    Plaintiff Porter and Minnesota Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

451.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and Minnesota Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

452.    Plaintiff Porter and Minnesota Subclass members seek relief under Minn. Stat. § 8.31, subd. 3a; and § 325D.45, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 29**
**Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010, *et seq.***
**On Behalf of the Missouri Subclass**

453.    Plaintiffs incorporate by reference all preceding paragraphs.

454.    Plaintiffs Delores Brown and Donald Basemore bring this cause of action individually and on behalf of the members of the Missouri Subclass.

455.    The Missouri Merchandising Practices Act ("MMPA") was created to protect Missouri consumers from deceptive and unfair business practices.

456.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Products, in trade or commerce in Missouri, making it unlawful under Mo. Rev. Stat. § 407.020.

457.    Plaintiffs Basemore, Brown, and the Missouri Class members purchased the Recalled Products for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mo. Rev. Stat. § 407.020. Plaintiffs Basemore, Brown, and the Missouri Class members acted as reasonable consumers would have acted under the circumstances and Philips' conduct declared unlawful by Mo. Rev. Stat. § 407.020 would cause reasonable persons to enter into the transactions (purchasing the Recalled Products) that resulted in the damages.

458.    Accordingly, pursuant to Mo. Rev. Stat. § 407.025, Plaintiffs Basemore, Brown, and the Missouri Class members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Products as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Products, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips conduct, the Court should exercise its discretion to award Plaintiffs Basemore, Brown, and the Missouri Class Members punitive damages,

attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT 30**
**Montana Unfair Trade Practices and Consumer Protection Act of 1973**
**Mont. Code Ann. §§ 30-14-101, *et seq.***
**On Behalf of the Montana Subclass**

459.    Plaintiffs incorporate by reference all preceding paragraphs.

460.    Plaintiff Worman brings this cause of action individually and on behalf of the members of the Montana Subclass.

461.    The Montana Unfair Trade Practices and Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

462.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Montana Subclass members, in violation of Mont. Code Ann. §§ 30-14-103, including by concealing the true risks of the Recalled Products.

463.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by *id.,* § 30-14-102(8).

464.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

465.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Montana Subclass members.

466.    Plaintiff Worman and Montana Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

467.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Worman and Montana Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

468.    Plaintiff Worman and Montana Subclass members seek relief under Mont. Code Ann. § 30-14-133, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT 31**
**Nebraska Consumer Protection Act**
**Neb. Rev. Stat. § 59-1601, _et seq_.**
**On Behalf of the Nebraska Subclass**

469.    Plaintiffs incorporate by reference all preceding paragraphs.

470.    Plaintiff Glaub brings this cause of action individually and on behalf of the members of the Nebraska Subclass.

471.    The Nebraska Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

472.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Nebraska Subclass Members, in violation of Neb. Rev. Stat. § 59-1602, including by concealing the true risks of the Recalled Products.

473.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

474.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

475.    Defendants' actions were negligent, knowing and willful, and/or wanton and

reckless with respect to the rights of Plaintiff Glaub and the Nebraska Subclass members.

476.    Plaintiff Glaub and Nebraska Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

477.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Glaub and Nebraska Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

478.    Plaintiff Glaub and Nebraska Subclass members seek relief under Neb. Rev. Stat. § 59-16-0, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

## COUNT 32
### Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. §§598.0903, *et seq.*
### On Behalf of the Nevada Subclass

479.    Plaintiffs incorporate by reference all preceding paragraphs.

480.    Plaintiffs Poland, McNulty, and Burlison bring this cause of action individually and on behalf of the members of the Nevada Subclass.

481.    Philips' conduct in the course of its business described herein constitutes deceptive trade practices as set forth in Nev. Rev. Stat. § 598.0915, because Philips: (a) knowingly made false representations as to the characteristics, ingredients, uses and benefits of the Recalled Products by falsely representing they are a safe and effective treatment for Obstructive Sleep Apnea and other breathing conditions; (b) represented that the Recalled Products were of a particular standard, quality or grade by falsely representing they are a safe and effective treatment for Obstructive Sleep Apnea and other breathing conditions; and (c) knowingly made other false representations in the transactions that resulted in Plaintiffs Burlison, Poland, McNulty, and the Nevada SubClass Members' ownership and use of the Recalled Products.

482.     Philips also engaged in deceptive trade practices in the course of its business under Nev. Rev. Stat. § 598.0923 by knowingly failing to disclose a material fact, the existence of the defective foam, in connection with the sales of the Recalled Products. Philips also engaged in deceptive trade practices in the course of its business under Nev. Rev. Stat. § 598.0925 by making an assertion of scientific, clinical or quantifiable fact, that the Recalled Products are a safe and effective treatment for Obstructive Sleep Apnea and other breathing conditions, in advertisements that would cause reasonable persons to believe the assertion was true when it did not have in its possession factually objective scientific, clinical or quantifiable evidence substantiating the assertion.

483.     Pursuant to Nev. Rev. Stat. § 41.600, Plaintiffs Burlison, Poland, McNulty, and the Nevada Class are entitled to recover for these deceptive trade practices the damages they have sustained: (a) the difference between the values of the Recalled Products as represented (their prices) and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Products, and (c) other miscellaneous incidental and consequential damages. In addition, they are entitled to recover any equitable relief the Court deems appropriate and their costs in the action and reasonable attorneys' fees.

484.     Pursuant to Nev. Rev. Stat. § 598.0977, Plaintiffs Burlison, Poland, McNulty, and the Nevada Subclass members over age 60 are entitled to recover the damages they suffered as a result of Philips's deceptive trade practices: (a) the difference between the values of the Recalled Products as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Products, and (c) other miscellaneous incidental and consequential damages. In addition, they are entitled to recover punitive damages, if appropriate, and reasonable attorneys' fees.

90

## COUNT 33
### New Hampshire Consumer Protection Act
### N.H. Rev. Stat. Ann. § 358-A:1, *et seq*.
### On Behalf of the New Hampshire Subclass

485.     Plaintiffs incorporate by reference all preceding paragraphs.

486.     Plaintiffs Vlahos and Lizotte brings this cause of action individually and on behalf of the members of the New Hampshire Subclass.

487.     The New Hampshire Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." N.H. Rev. Stat. Ann. § 358-A:2.

488.     Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs Vlahos and Lizotte and New Hampshire Subclass Members, in violation of N.H. Rev. Stat. Ann. § 358-A:2, including by concealing the true risks of the Recalled Products.

489.     The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

490.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

491.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Vlahos and Lizotte and the New Hampshire Subclass members.

492.     Plaintiffs Vlahos and Lizotte and New Hampshire Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

91

493.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Vlahos and Lizotte and New Hampshire Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

494.     Plaintiffs Vlahos and Lizotte and New Hampshire Subclass members seek relief under N.H. Rev. Stat. Ann. § 358-A:10, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

495.     A copy of this complaint is being sent to the New Hampshire Attorney General.

**COUNT 34**
**New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1, *et seq*.**
**On Behalf of the New Jersey Subclass**

496.     Plaintiffs incorporate by reference all preceding paragraphs.

497.     The New Jersey Consumer Fraud Act ("NJCFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  N.J. Stat. Ann.  § 56:8-2.

498.     Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs Ryan and Jacobs and New Jersey Subclass Members, in violation of  N.J. Stat. Ann. §§  56:8-2, including  by  making  statements  or  representations  that  were  false  or  misleading

regarding the quality of the Recalled Products, and concealing the true risks of the Recalled Products.

499.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

500.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Ryan and Jacobs and New Jersey Subclass members.

501.    Plaintiffs Ryan and Jacobs and New Jersey Subclass members relied on Defendants' representations and omissions in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known of the true risks of purchasing or using the Recalled Products.

502.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Ryan and Jacobs and New Jersey Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above, including the purchase of the Recalled Products and the costs or repairing or replacing the Recalled Products in a timely manner.

503.    Plaintiffs Ryan and Jacobs and New Jersey Subclass members seek relief under N.J. Stat. Ann. §§ 56:8-2.11 and 56:8-19, including, but not limited to a refund of all moneys acquired by Defendants for the Recalled Product, injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT 35**
**New Mexico Unfair Practices Act**
**N.M. Stat. Ann. §§ 57-12-1, *et seq.***
**On Behalf of the New Mexico Subclass**

504.    Plaintiffs incorporate by reference all preceding paragraphs.

505.    Plaintiffs Jo Dawn Ward and Myron Fields bring this cause of action individually and on behalf of the members of the New Mexico Subclass.

506.     The New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. §§ 57-12-1, et seq. ("New Mexico UTPA") makes unlawful any "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. STAT. ANN. § 57:12-3. Trade or commerce includes the "sale or distribution of any services." N.M. STAT. ANN. § 57-12-2(C).

507.     Defendants engaged in unfair or deceptive trade practices and unconscionable trade practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs and New Mexico Subclass Members, in violation of  N.M. Stat. Ann. § 57-12-3, including by making statements or representations that were false or misleading regarding the quality of the Recalled Products and concealing the true risks of the Recalled Products.

508.     The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by *id.,* § 57-12-2(C).

509.     The above unfair or deceptive trade practices and unconscionable trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous, and the type that may, tend to, or does deceive or mislead any person.

510.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the New Mexico Subclass members.

511.     Plaintiffs Ward and Fields and New Mexico Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

512.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Ward and Fields and New Mexico Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

513.    By engaging in the practices discussed above, including, but not limited to, Defendants' undisclosed defects, Defendants have violated N.M. Stat. Ann. § 57-12-2.

514.    Plaintiffs Ward and Fields and New Mexico Subclass members seek relief under N.M. Stat. Ann. § 57-12-10, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 36**
**N.Y. Gen. Bus. Law § 349**
**On Behalf of the New York Subclass**

515.    Plaintiffs incorporate by reference all preceding paragraphs.

516.    Plaintiffs Scunziano and Gold bring this cause of action individually and on behalf of the members of the New York Subclass.

517.    Plaintiffs Scunziano and Gold and the New York Subclass Members are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

518.    Defendants are a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

519.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendants' conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL.  All of Defendants' deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing Recalled Products, constitute conduct directed at consumers and "consumer-oriented." Further, Plaintiffs Scunziano and Gold and the New York Subclass Members suffered injury as a result of the deceptive acts or practice.

520.    Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

521.    Defendants participated in unfair or deceptive trade practices that violated the New York GBL as described below and alleged throughout the Complaint. By concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

522.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

523.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

524.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

525.    Defendants knew or should have known that their conduct violated the New York GBL.

526.    Had Plaintiffs Scunziano and Gold and the New York Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

527.     Defendants owed Plaintiffs Scunziano and Gold and the New York Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiffs Scunziano and Gold and the New York Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiffs Scunziano and Gold and the New York Subclass Members that contradicted these representations.

528.     Plaintiffs and the New York Subclass Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiffs and the New York Subclass Members were harmed and suffered actual damages.

529.     Defendants' violations present a continuing risk to Plaintiffs Scunziano and Gold and the New York Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

530.     Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass Members seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and the New York Subclass Members also seek attorneys' fees, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under the New York GBL.

### COUNT 37
### North Carolina Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. §§ 75-1.1, *et seq.*
### On Behalf of the North Carolina Subclass

531.     Plaintiffs incorporate by reference all preceding paragraphs.

532.     Plaintiff Tony Jones brings this cause of action individually and on behalf of the members of the North Carolina Subclass.

533.     North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

534.     Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and North Carolina Subclass Members, in violation of N.C. Gen. Stat. § 75-1.1(a), including by making false representations or concealing the true risks of the Recalled Products.

535.     The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by *id.,* § 75-1.1(b).

536.     The above unfair or deceptive acts or practices by Defendants were reasonably calculated to deceive class members and other consumers, and made with intent to deceive.

537.     The above unfair or deceptive acts or practices by Defendants did in fact deceive class members and other consumers, causing them damage.

538.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

539.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the North Carolina Subclass members.

540.     Plaintiff Tony Jones and North Carolina Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

541.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and North Carolina Class Members suffered an ascertainable loss of money or property, real or personal.

542.     Plaintiff Tony Jones and North Carolina Subclass members seek relief under N.C. Gen. Stat. §§ 75-16 and 75-16.1, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT 38**
**North Carolina Consumer Protection Act**
**N.D. Cent. Code § 51-15-01, *et seq*.**
**On Behalf of the North Dakota Subclass**

543.     Plaintiffs incorporate by reference all preceding paragraphs.

544.     Plaintiff Byers brings this cause of action individually and on behalf of the members of the North Dakota Subclass.

545.     Under North Dakota law, the use of deceptive or unconscionable acts or practices in connection with the sale or advertisement of any merchandise is unlawful.  N.D. Cent. Code § 51-15-02.

546.     Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff Byers and North Dakota Subclass Members, in violation of N.D. Cent. Code § 51-15-01, et. seq., including by misrepresenting the true quality of the Recalled Products, concealing the true risks of the Recalled Products.

547.     The above unfair methods of competition and unfair or deceptive acts or practices

by Defendants were immoral, unethical, oppressive, and unscrupulous.

548.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Byers and the North Dakota Subclass members.

549.    Plaintiff Byers and North Dakota Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

550.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Byers and North Dakota Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above.

551.    Plaintiff Byers and North Dakota Subclass members seek relief under N.D. Cent. Code. § 51-15-09, *et seq.*, including, but not limited to injunctive relief, compensatory damages, treble damages, and attorneys' fees and costs. N.D. Cent. Code. § 51-15-09.

**COUNT 39**
**Ohio Consumer Sales Practices Act**
**Ohio Rev. Code Ann. §§ 1345.01, *et seq.***
**On Behalf of the Ohio Subclass**

552.    Plaintiffs incorporate by reference all preceding paragraphs.

553.    Plaintiff Ward brings this cause of action individually and on behalf of the members of the Ohio Subclass.

554.    Ohio make it unlawful to "commit an unfair or deceptive act or practice in connection with a consumer transaction" Ohio Rev. Code Ann. § 1345.02.

555.    Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Ohio Subclass Members, in violation of Ohio Rev. Code Ann. §§ 1345.021 *et seq.*, including by misrepresenting the true quality of the Recalled

Products and concealing the true risks of the Recalled Products.

556.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

557.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Ward and Ohio Subclass members.

558.     Plaintiff Ward and Ohio Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

559.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and Ohio Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above.

560.     Plaintiff Ward and Ohio Subclass members seek relief under Ohio Rev. Code § 1345.09, *et seq*., including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 40**
**Oklahoma Consumer Protection Act**
**Okla. Stat. tit. 15, § 751, *et seq.***
**On Behalf of the Oklahoma Subclass**

561.     Plaintiffs incorporate by reference all preceding paragraphs.

562.     Plaintiff Wells brings this cause of action individually and on behalf of the members of the Oklahoma Subclass.

563.     The Oklahoma Consumer Protection Act makes it unlawful to make a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person," or engage in "any practice which

offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Okla. Stat. tit. 15, § 752.

564.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Oklahoma Subclass Members, in violation of Okla. Stat. tit. 15, § 752, including by concealing the true risks of the Recalled Products.

565.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of a "consumer transaction," as defined by Okla. Stat. tit. 15, § 752.

566.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

567.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Wells and the Oklahoma Subclass members.

568.    Plaintiff Wells and Oklahoma Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

569.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Wells and Oklahoma Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

570.    Plaintiff Wells and Oklahoma Subclass members seek relief under Okla. Stat. tit. 15, § 75, *et seq*., including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, civil penalties and attorneys' fees and costs.

**COUNT 41**
**Oregon Unlawful Trade Practices Law**
**Or. Rev. Stat. §§ 646.605, *et seq.***
**On Behalf of the Oregon Subclass**

571.    Plaintiffs incorporate by reference all preceding paragraphs.

572.    Plaintiff Mclean brings this cause of action individually and on behalf of the members of the Oregon Subclass.

573.    Oregon make it unlawful to for any person to employ "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation." Or. Rev. Stat. § 646.607(1).

574.    Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Oregon Subclass Members, in violation of Or. Rev. Stat. §§ 646.605, *et seq.*, including by misrepresenting the true quality of the Recalled Products, concealing the true risks of the Recalled Products..

575.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade" and/or "commerce," as defined by Or. Rev. Stat. § 646.605(8).

576.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

577.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Oregon Subclass members.

578.    Plaintiff Mclean and Oregon Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

103

579. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Mclean and Oregon Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

580. Plaintiff Mclean and Oregon Subclass members seek relief under Or. Rev. Stat. § 646.638, *et seq*., including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, civil penalties and attorneys' fees and costs.

### COUNT 42
### Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201-1, *et seq*.
### On Behalf of the Pennsylvania Subclass

581. Plaintiffs incorporate by reference all preceding paragraphs.

582. Plaintiff Koenck brings this cause of action individually and on behalf of the members of the Pennsylvania Subclass.

583. Plaintiff Koenck and the Pennsylvania Subclass Members purchased their Recalled Products primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

584. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

585. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including, "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

586. Defendants participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout the Complaint.  By concealing the

104

true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Products. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

587. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

588. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

589. Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

590. Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

591. Had Plaintiff Koenck and the Pennsylvania Subclass Members known the truth about the Recalled Products, they would not have purchased the Recalled Products. Plaintiff did not receive the benefit of their bargain as a result of Defendants' misconduct.

592. Defendants owed Plaintiff and the Pennsylvania Subclass Members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Pennsylvania Subclass Members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding

105

material facts from Plaintiff and the Pennsylvania Subclass Members that contradicted these representations.

593.    Plaintiff Koenck and the Pennsylvania Subclass Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Koenck and the Pennsylvania Subclass Members were harmed and suffered actual damages.

594.    Defendants' violations present a continuing risk to Plaintiff Koenck and the Pennsylvania Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

595.    Defendants are liable to Plaintiff and the Pennsylvania Subclass Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Plaintiff Koenck and the Pennsylvania Subclass Members are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT 43**
**Rhode Island Unfair Trade Practice and Consumer Protection Act**
**R.I. Gen. Laws §§ 6-13.1-1, *et seq*.**
**On Behalf of the Rhode Island Subclass**

596.    Plaintiffs incorporate by reference all preceding paragraphs.

597.    Plaintiff Lamontagne brings this cause of action individually and on behalf of the members of the Rhode Island Subclass.

598.    The Rhode Island Unfair Trade Practice and Consumer Protection Act ("Rhode Island Act") identifies several types of "unfair" and/or "deceptive trade practices, but also incorporates by reference "the Federal Trade Commission's and federal courts' interpretations of section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)," rather than set forth specific definitions of those operative terms.  R.I. Gen. Laws § 6-13.1-2.

106

599.    Rhode Island has adopted a three-part test to determine whether an act is "deceptive": (1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), the representation, omission, or practice is material," meaning the representation is important to the consumer and likely to affect their decisions with respect to the product.

600.    Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Rhode Island Subclass Members, in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq*., including by misrepresenting the true quality of the Recalled Products and concealing the true risks of the Recalled Products.

601.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade" and/or "commerce," as defined by R.I. Gen. Laws § 6-13.1-1(5).

602.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

603.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Rhode Island Subclass members.

604.    Defendants' actions were material to Plaintiff and Rhode Island Subclass members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

605.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and Rhode Island Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

606.     Plaintiff and Rhode Island Subclass members seek relief under R.I. Gen. Laws §§ 6-13.1-5.2, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT 44**
**South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. §§ 39-5-10,** *et seq.*
**On Behalf of the South Carolina Subclass**

607.     Plaintiffs incorporate by reference all preceding paragraphs.

608.     Plaintiffs Harris Jenkins and Vicki Chambers bring this cause of action individually and on behalf of the members of the South Carolina Subclass.

609.     The South Carolina Unfair Trade Practices Act adopts the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to determine what conduct constitutes unfair or deceptive acts and practices.  S.C. Code Ann. § 39-5-20.

610.     Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs Jenkins and Chambers and South Carolina Subclass Members, in violation of S.C. Code Ann. § 39-5-20, including by concealing the true risks of the Recalled Products.

611.     The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by S.C. Code Ann. § 39-5-10(b).

612.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

613.    The above unfair and deceptive practices and acts by Defendants have impacted the South Carolina public at large if Defendants are not forced to cease engaging in such acts and practices, they are likely to continue.

614.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Chambers and Jenkins and the South Carolina Subclass members.

615.    Plaintiffs Chambers and Jenkins and South Carolina Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

616.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and South Carolina Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

617.    Plaintiffs and South Carolina Subclass members seek relief under S.C. Code § 39-5-140, including, but not limited to restitution, statutory damages, compensatory damages, punitive damages, civil penalties and attorneys' fees and costs.

<u>**COUNT 45**</u>
**Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-101, *et seq*.**
<u>**On Behalf of the Tennessee Subclass**</u>

618.    Plaintiffs incorporate by reference all preceding paragraphs.

619.    Plaintiff Craig brings this cause of action individually and on behalf of the members of the Tennessee Subclass.

620.    The Tennessee Consumer Protection Act ("TNCPA") was enacted to "protect consumers…from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within [Tennessee]."  Tenn. Code Ann. § 47-18-102(2).

621.    The TNCPA makes unlawful, among other things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have" and "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."  Tenn. Code Ann. § 47-18-104.

622.    Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Tennessee Subclass Members, in violation of  Tenn. Code Ann. §§ 47-18-101, *et seq*., including by making statements or representations that were false or misleading regarding the quality of the Recalled Products and concealing the true risks of the Recalled Products .

623.    Defendants intended that other persons rely on the above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact, and their reliance was reasonable.

624.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

625.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Tennessee Subclass members.

626.    Plaintiff Craig and Tennessee Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

627.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Craig and Tennessee Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

628.    Plaintiff Craig and Tennessee Subclass members seek relief under Tenn. Code § 47-18-108-109, including, but not limited to injunctive relief, compensatory damages, statutory damages, punitive damages, statutory damages, civil penalties and attorneys' fees and costs.

**COUNT 46**
**Utah Consumer Sales Practices Act**
**Utah Code Ann. §§ 13-11-1, *et seq.***
**On Behalf of the Utah Subclass**

629.    Plaintiffs incorporate by reference all preceding paragraphs.

630.    Plaintiff Nagy brings this cause of action individually and on behalf of the members of the Utah Subclass.

631.    The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq*. makes it unlawful to, among other things, "knowingly or intentionally" "indicate[] that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  Utah Code Ann. § 13-11-4.

632.    A "Consumer transaction" means a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance) to, or apparently to, a person for…primarily personal, family, or household purposes." Utah Code Ann. § 13-11-3.

633.    Defendants engaged in unfair or deceptive trade practices and unconscionable trade practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Utah Subclass Members, in violation of  Utah Code Ann. §§ 13-11-1, *et seq*.,

including by making statements or representations that were false or misleading regarding the quality of the Recalled Products and concealing the true risks of the Recalled Products.

634.   The above unfair or deceptive trade practices and unconscionable trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous, and the type that may, tend to, or does deceive or mislead any person.

635.   Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Utah Subclass members.

636.   Plaintiff Nagy and Utah Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

637.   As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Nagy and Utah Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above.

638.   By engaging in the practices discussed above, including, but not limited to, Defendant's undisclosed defects, Defendant has violated Utah Code Ann. §§ 13-11-1, *et seq*.

639.   Plaintiff Nagy and Utah Subclass members seek relief under Utah Code Ann. § 13-11-17 and -19, including, but not limited to injunctive relief, compensatory damages, statutory damages, civil penalties and attorneys' fees and costs.

**COUNT 47**
**Vermont Consumer Fraud Act**
**Vt. Stat. Ann. tit. 9, §§ 2451, *et seq*.**
**On Behalf of the Vermont Subclass**

640.   Plaintiffs incorporate by reference all preceding paragraphs.

641.   Plaintiff Martin brings this cause of action individually and on behalf of the members of the Vermont Subclass.

642.    The Vermont Consumer Fraud Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453, et. seq.

643.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Vermont Subclass Members, in violation of Vt. Stat. Ann. tit. 9, § 2453 including by concealing the true risks of the Recalled Products.

644.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

645.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

646.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Martin and the Vermont Subclass members.

647.    Plaintiff Martin and Vermont Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known that the Recalled Products were defective.

648.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Martin and Vermont Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above.

649.    Plaintiff Martin and Vermont Subclass members seek relief Vt. Stat. Ann. tit. 9, § 2461(b). including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT 48**
**Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1-196, *et seq.***
**On Behalf of the Virginia Subclass**

650.    Plaintiffs incorporate by reference all preceding paragraphs.

651.    Plaintiffs Rose and Gorris bring this cause of action individually and on behalf of the members of the Virginia Subclass.

652.    Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*. ("VCPA") was enacted to "promote fair and ethical standards of dealings between suppliers and the consuming public."

653.    Philips committed the following acts declared unlawful and prohibited by Va. Code Ann. § 59.1-200: (a) misrepresenting the qualities, characteristics, ingredients, uses and benefits of the Recalled Products by falsely representing they are a safe and effective treatment for Obstructive Sleep Apnea and other breathing conditions; (b) misrepresenting that the Recalled Products were of a particular standard, quality or grade by falsely representing they are a safe and effective treatment for Obstructive Sleep Apnea and other breathing conditions; and (c) using other deception, false promise or misrepresentation in connection with the transactions that resulted in Plaintiffs Gorris, Rose, and the Virginia Class members' ownership and use of the Recalled Products.

654.    Because they suffered loss as a result of Philips' violations of the VCPA, Plaintiffs Gorris, Rose, and the Virginia Class members may each recover actual damages or $500, whichever is greater, pursuant to Va. Code Ann. § 59.1-204. Because Philips' violations were willful, the jury may increase the damages to an amount not exceeding three times the actual damages or $1,000, whichever is greater. The actual damages are: (a) the difference between the values of the Recalled Products as represented (their prices) and their actual values at the time of

purchase ($0.00), or (b) the cost to replace the Recalled Products, and (c) other miscellaneous incidental and consequential damages. In addition, Plaintiffs Gorris, Rose, and the Virginia Class members are entitled to recover reasonable attorneys' fees and court costs. The Court may award additional relief pursuant to Va. Code Ann. § 59.1-205.

**COUNT 49**
**Washington Consumer Protection Act**
**Wash. Rev. Code § 19.86.020, *et. seq*.**
**On Behalf of the Washington Subclass**

655.    Plaintiff Lopez incorporates by reference all preceding paragraphs.

656.    Plaintiff Lopez brings this cause of action individually and on behalf of the members of the Washington Subclass.

657.    The Washington Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

658.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the Recalled Products purchased by Plaintiff and Washington Subclass Members, in violation of Wash. Rev. Code §§ 19.86.010, *et seq.*, including by concealing the true risks of the Recalled Products.

659.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of "trade" or "commerce" as defined by Wash. Rev. Code § 19.86.010.

660.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

661.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Washington Subclass members.

662.    Plaintiff and Washington Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

663.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Washington Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

664.    Plaintiff and Washington Subclass members seek relief under Wash. Rev. Code §§ 19.86.090, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, civil penalties and attorneys' fees and costs.

**COUNT 50**
**Wisconsin False Advertising Act**
**Wis. Stat. § 100.18**
**On Behalf of the Wisconsin Subclass**

665.    Plaintiffs incorporate by reference all preceding paragraphs.

666.    Plaintiff Alt brings this cause of action individually and on behalf of the members of the Wisconsin Subclass.

667.    Wisconsin law prohibits companies from making "untrue, deceptive, or misleading" statements in any "notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, [or] label" in selling merchandise. Wis. Stat. § 100.18(1).

668.    Defendants made "untrue, deceptive or misleading" statement with respect to the sale and advertisement of the Recalled Products purchased by Plaintiffs and Wisconsin Subclass Members, in violation of Wash. Rev. Code §§ 19.86.010, *et seq.*, including by concealing the true risks of the Recalled Products.

669.    The above untrue, deceptive, or misleading acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

670.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Alt and the Wisconsin Subclass members.

671.    Plaintiff Alt and Wisconsin Subclass members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

672.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff Alt and Wisconsin Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

673.    Plaintiff Alt and Wisconsin subclass members have suffered pecuniary loss and seek damages, including double damages, costs, and attorneys' fees.  Wis. Stat. § 108.18(11)(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, individually and on behalf of the Class and Subclasses, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and Subclasses defined above, and designate Plaintiffs as the class representatives and Plaintiffs' counsel as counsel for the Nationwide Class and Subclasses;

B.    award equitable and injunctive relief, including but not limited to, requiring Defendants to institute a medical monitoring program for Class and Subclass members, restitution, and disgorgement of profits;

C.    award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

117

E.    award reasonable attorneys' fees and costs; and

F.    grant such further and other relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: August 16, 2021        Respectfully Submitted,

**BLOCK & LEVITON LLP**

*/s/ Jason M. Leviton*
Jason M. Leviton
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
jason@blockleviton.com

**GIRARD SHARP LLP**
Dena Sharp
dsharp@girardsharp.com
Adam E. Polk*
apolk@girardsharp.com
Tom Watts*
tomw@girardsharp.com
Makenna Cox*
mcox@girardsharp.com

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
P.O. Box 67101
Chestnut Hill MA 02467
Telephone: (617) 999-6473
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

**BRONSTEIN GEWIRTZ & GROSSMAN LLC**
Peretz Bronstein, Esq.
60 East 42nd Street, Suite 4600
New York, NY 10165-0006
peretz@bgandg.com

**BERGER MONTAGUE PC**
Shanon J. Carson*
Dena Young*
John Kerrigan*
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
scarson@bm.net
dyoung@bm.net
jkerrigan@bm.net

**BERGER MONTAGUE PC**
E. Michelle Drake*
John G. Albanese*
1229 Tyler Street NE
Suite 205
Tel.: (612) 597-5997
emdrake@bm.net
jalbanese@bm.net

**BAILEY & GLASSER LLP**
John Roddy (BBO No. 424240)
Elizabeth Ryan (BBO No. 549632)
176 Federal Street, 5th Floor
Boston, MA 02110
(617) 439-6730

118

Randi Kassan (MA Bar No. 568656)
Mitchell Breit*
Blake Hunter Yagman*

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.: 516-741-5600
rkassan@milberg.com
mbreit@milberg.com
byagman@milberg.com

Daniel K. Bryson*
Patrick M. Wallace*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan St. Raleigh, N.C. 27603
Tel.: 919-600-5000
dbryson@milberg.com
pwallace@milberg.com

**MASON, LEITZ, & KLINGER LLP**
Gary E. Mason*
5101 Wisconsin Avenue NW, Suite 305
Washington, D.C. 20016
T: (202) 429-2290
F: (202) 429-2294
gmason@masonllp.com

**MASON, LEITZ, & KLINGER LLP**
Gary M. Klinger*
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
T: (202) 429-2290
gklinger@masonllp.com

**SHUB LAW FIRM LLC**
Jonathan Shub*
Kevin Laukaitis*
134 Kings Hwy E., Fl. 2
Haddonfield, NJ 08033
T: 856-772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

jroddy@baileyglasser.com
eryan@baileyglasser.com

**COHEN & MALAD, LLP**
Irwin B. Levin*
Richard E. Shevitz*
Natalie Lyons*
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
rshevitz@cohenandmalad.com
ilevin@cohenandmalad.com
nlyons@cohenandmalad.com

**BERNHEIM KELLEY BATTISTA
BLISS LLC**
Walter Kelley, BBO #670525
4 Court Street
Plymouth, MA 02360
Tele: (617) 865-3641
wkelley@realjustice.com

**LEVIN PAPANTONIO RAFFERTY
PROCTOR BUCHANAN O'BRIEN
BARR & MOUGEY P.A.**
Virginia Buchanan, Esq.*
Winston Troy Bouk, Esq.*
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Buchanan Phone: (850) 435-7081
Bouk Phone: (850) 435-7155
Fax: (850) 436-
vbuchanan@levinlaw.com
tbouk@levinlaw.com

**PASTOR LAW OFFICE, LLP**
David Pastor (BBO # 391000)
63 Atlantic Avenue, 3d Floor
Boston, Massachusetts 02110
Tel: (617)742-9700
Fax: (617)742-9701
Email: dpastor@pastorlawoffice.com

**ANASTOPOULO LAW FIRM LLC**
Roy T. Willey, IV*
Eric M. Poulin*

**FREDERICK LAW GROUP, PLLC**
Troy M. Frederick*
Beth A. Frederick*
836 Philadelphia Street
Indiana, PA 15701
Telephone: (724) 801-8555
Fax: (724) 801-8358
TMF@FrederickLG.com
BAF@FrederickLG.com

**JEEVES MANDEL LAW GROUP, P.C.**
Roger L. Mandel*
rmandel@jeevesmandellawgroup.com
khill@jeeveslawgroup.com
2833 Crockett Street, Suite 135
Fort Worth, TX 75251
Tel: (214) 253-8300

**THE JEEVES LAW GROUP, P.A.**
Scott R. Jeeves*
sjeeves@jeeveslawgroup.com
khill@jeeveslawgroup.com
954 First Avenue North
St. Petersburg, FL 33705
Telephone: (727) 894-2929

**CRAIG E. ROTHBURD, P.A.**
Craig E. Rothburd*
crothburd@e-rlaw.com
320 W. Kennedy Blvd., Suite 700
Tampa, FL 33606
Telephone: (813) 251-8800

*Pro Hac Vice Forthcoming

Blake G. Abbott*
Jarrett W. Withrow*
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-8888
Fax: (843) 494-5536
Email: roy@akimlawfirm.com
eric@akimlawfirm.com
blake@akimlawfirm.com
jarrett@akimlawfirm.com

**EDELSON LECHTZIN LLP**
Marc H. Edelson
Eric Lechtzin
3 Terry Drive, Suite 205
Newtown, PA 18940
T: 215-867-2399
medelson@edelson-law.com
elechtzin@edelson-law.com